## MORGAN v. THE STATE.

CRIMINAL LAW.—*Change of Venue.—Affidavits.*—In a criminal action the defendant moved for a change of venue on account of local excitement and prejudice, and filed affidavits in support of the motion. Counter affidavits were filed by the State; and thereupon the defendant moved for leave to file additional affidavits in support of the application, which the court refused.

*Held,* that as no additional affidavits were offered by the defendant, no question could be raised in the Supreme Court upon this ruling.

SAME.—*Judicial Discretion.—Query,* whether the Supreme Court ought, under

any circumstances, to reverse the ruling of a court refusing to grant a change of venue where the affidavit is founded upon excitement or prejudice in the county against the defendant.

SAME.—*Juror.— Competency.— Previously Formed Opinion.—Rumor.—Newspaper Statements.*—On the examination of persons called as jurors to try an indictment for murder, as to their competency, certain ones of the panel answered, that they had formed opinions as to the guilt or innocence of the defendant, from rumor and newspaper statements on that subject. Upon further examination each of said persons answered, that it would require neither more nor less evidence to satisfy him of the existence or non-existence of the material facts involved in the case by reason of his so already formed opinion. The court thereupon overruled the defendant's challenge "for cause."

*Held,* that this ruling was correct.

DYING DECLARATIONS.— *When Admitted.*—Where the statements of a person are offered in evidence as his dying declarations, the proof must clearly show that the declarant was in fact at the very point of death, and that he was fully conscious of that fact, not as a thing of surmise and conjecture, or apprehension, but as a fixed and inevitable fact.

SAME.—It is not required that the deceased should have declared in terms that he expected to die at once, if his condition was such that, of necessity, such an impression must have existed on his mind. On the other hand, no matter how strong the expression of this certainty of death may have been, if there be any evidence of hope in the language or actions of the declarant, his statements will be rejected.

APPEAL from the Vigo Criminal Circuit Court.

RAY, J.—The appellant was indicted in the Vigo Criminal Circuit Court, on the 15th day of July, 1869, for the murder of John Petri on the 11th day of the same month. He was arraigned and pleaded not guilty, upon the day the indictment was found, and entered upon his trial on the 19th day of the month.

A motion was made for a change of venue, supported by the affidavits of the appellant and two other persons.

The affidavits alleged, that a bitter feeling and intense excitement existed over the entire county, created by the circumstances attending the death of Petri, which would prevent the appellant from receiving a fair and impartial trial within the jurisdiction of that court; that certain publications had been made in all the newspapers of that locality, calculated to cause, and which had resulted in producing, a

conviction in the public mind of the guilt of the accused, and rendering it impossible to secure disinterested and unbiassed triers. Counter affidavits were also presented by the State, embracing one made by the sheriff of the county and also the sworn statements of five other citizens, that the excitement and ill feeling manifested toward the prisoner was confined to the city of Terre Haute, and that a jury free from all improper influences could be secured from other portions of the county. The appellant thereupon moved the court for leave to file other and additional affidavits in support of his application for a change of venue. This the court refused. Inasmuch as no additional affidavits were offered, no question arises upon this ruling. The judgment of the court is not to be invoked in mere wantonness. Upon the presentation of an affidavit for the purpose of filing it in the case, a ruling of the court may be required, which may be the subject of review here. Upon an examination of an affidavit thus presented, with all the circumstances attending the motion, brought before us by a bill of exceptions, we have a basis upon which to question or approve the judgment of the court below.

The motion for a change of venue was overruled. We are asked to review this action of the court. In the case of *Anderson* v. *The State*, 28 Ind. 22, the same point was presented, and after a careful consideration of the subject, we affirmed the ruling of the circuit court. The present application for a change of venue is not more strongly supported. The affidavits here presented disclose a feeling of strong excitement in the city near which the crime was committed. This was not extraordinary. A terrible offense had been perpetrated. The residence of a reputable citizen had been feloniously entered on Sunday noon, during the absence of the family, and upon the sudden return of the proprietor, he is killed in his own bed-room by the felon. The arrest follows, the same evening. Horror at the crime, indignation against the perpetrator, and a desire for swift and sure punishment convulse the community. The grand jury are at once sum-

moned, an indictment is found, and on the fourth day from the tragedy the accused pleads for his life, in the midst of a community thus wrought upon—pleads when his counsel even act under the appointment of the court. Under such circumstances, the position of the judge before whom the suspected criminal stands involves grave responsibilities. Under such circumstances, it sometimes happens that public clamor demands of the court, not a just administration of the law, but its aid in securing through legal forms some victim to popular indignation. It were better that the mob should execute its will—terrible as the alternative may be—than that a judge should yield one right secured to the prisoner by the law. The court, when the excitement is passed, will retain the public confidence in its due and proper administration of the law—a loss of which would be irreparable. The excess of popular violence, although it cannot correct the injustice it may have worked, will bring an assured repentance.

We do not intend by these remarks to imply that we are satisfied that there has been in this case an abuse of the discretion confided to the court, but we make them because it is apparent that the surroundings were not such as most certainly to secure, what the appellant was clearly entitled to, a fair trial before men who had not prejudged his case. We are not content by our silence seemingly to approve the haste which places the accused, within the 'week his alleged victim expires, in the midst of a community excited by the outrage, on trial for his life. A jury, however, were empanelled from other portions of the county, where it was alleged no unusual excitement existed, and as the statute places the matter of a change of the locality of the trial within the discretion of the judge before whom the application is made, we do not feel that the present case authorizes us to reverse the ruling, if, indeed, we ought to do so under any circumstances.

On the examination of persons called as jurors, as to their competency, five of the panel answered, that they had formed

an opinion as to the guilt or innocence of the appellant, from rumor and newspaper statements on that subject. Upon further examination, each of said persons answered, that it would require neither more nor less evidence to satisfy him of the existence or non-existence of the material facts involved in the case, by reason of such already formed opinion. The court thereupon overruled the challenge by appellant "for cause."

This ruling was in full accord with the decision of this court in the case of *Fahnestock* v. *The State*, 23 Ind. 231. It is in vain, in the presence of a telegraph that throbs with every beat of the world's life, and a daily press to register each pulsation, for courts longer to expect ignorance of a fact notorious combined with general intelligence. Ignorance of a matter made notorious by publication will seldom be found where sufficient discrimination exists to detect falsehood from truth. The rapidity with which information is conveyed, and the haste to place it before the public, involve so much inaccuracy in its statement that experience soon instructs the reader, and the impression formed fades at once before the living witness. An impression so left is practically harmless, and a theory which rejects such jurors cannot be sustained in practice.

On the trial, the statement made by Petri, on Sunday afternoon, about an hour after the shooting had occurred, in regard to the circumstances attending the injury, were offered as his dying declarations; and upon certain evidence as to his condition at the time the statements were made being adduced, the court, over the objection of the appellant, permitted them to go to the jury. It is assigned as error, that the evidence as to the condition of Petri did not show him to have been *in extremis* at the time his declarations were made.

It is a relief when called upon to test a given state of facts by a rule of law, to find that rule well defined, marked, and clear, founded upon a plain reason, and sustained by uniform authority.

Such is the rule under which certain statements made by one speaking, not under the obligation of an oath, but in the very presence of death, are received in evidence. No well considered case has attempted to extend or limit the established rule; and where error has been committed, it has occurred in its application to facts. The principle, as stated by Lord Chief Baron EYRE, on which this species of evidence is admitted is, that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced, by the most powerful considerations, to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice. *Woodcock's Case,* 2 Leach (3d ed.), 563.

In the last edition of Greenleaf on Evidence, vol. 1, p. 182, Judge REDFIELD has added this note to the text: This evidence "is not received upon any other ground than that of necessity, in order to prevent murder going unpunished. What is said in the books about the situation of the declarant, he being virtually under the most solemn sanction to speak the truth, is far from presenting the true ground of the admission, for if that were all that is requisite to render the declarations evidence, the apprehension of death should have the same effect, since it would place the declarant under the same restraint as if the apprehension were founded in fact. But both must concur, both the fact and the apprehension of being *in extremis.* This presumption and the consequent probability of the crime going unpunished, is unquestionably the chief ground of this exception in the law of evidence;" and accordingly they are received, "only where the death of the deceased is the subject of the charge, and the circumstances of the death the subject of the declarations." *The King v. Mead,* 2. B. & C. 605; 1 Phillipps Ev. (4th Am. ed.) 287; 1 Greenl. Ev. 181.

As this class of evidence forms an exception to the gen-

eral rule; as there can be no cross examination of the declarant; as the accused cannot often meet his accuser face to face; and as there must of necessity exist great danger of abuse; it must clearly appear that the statements offered in evidence have been made under a full realization that the solemn hour of death has come. In the case of *Smith* v. *The State,* 9 Humph. 9, it is said, "Testimony of this character is only admitted from necessity, and an abuse of it is guarded against by the law with most minute particularity. There is no one principle better established than that such declarations shall not be received unless the proof clearly shows that the deceased was *in extremis* (perhaps the words *in articulo mortis,* which are used by some of the authorities to express this condition, are more accurate) and that he or she, at the time of making them, was fully conscious of that fact, not as a thing of surmise and conjecture or apprehension, but as a fixed and inevitable fact." One eminent writer calls it the apprehension of "impending death." 2 Ev. Poth. 293. In the note to Phillipps on Ev. vol. 1, p. 291, it is said, "In the meantime he is not only certain of ultimate death, but he is strongly persuaded that death is rapidly approaching. It is so near that all motives to falsehood are superseded by the strongest inducements to strict veracity." "The judge should be satisfied that the declaration was made under an impression of almost immediate dissolution." *Ib.* See, also, *Rex* v. *Callaghan,* MacNally Ev. 385.

It is not required that the deceased should have declared in terms that he expected to die at once, if his condition be such that, of necessity, such an impression must exist on his mind. In *Woodcock's Case, supra,* it was deemed sufficient, to show that the deceased had been mortally wounded and was in a condition which rendered almost immediate death inevitable; and that she was thought by every person about her to be dying. No matter how strong the expression of this certainty of death may be, if there be any evidence of

hope, in the language or actions of the declarant, his statements will be rejected.

The bill of exceptions states the following as the evidence upon which the declarations of Petri were admitted:—

. Charles May stated, "I asked John what was the matter. John pulled up his shirt and said, 'I am in a bad fix;' and John said he could not recover. This was about one or two o'clock on Sunday, about an hour after the shooting. That after this conversation took place, he, May, went for a doctor for Petri."

Moritz Hosmour stated, that he "saw Petri about an hour after he was shot and before the doctor got there, and he, Petri, told me he felt bad and thought he would not get well." The wounds were two in number, each from a small pistol ball; one in the left jaw, not dangerous; and the other lodged in the cavity of the abdomen. It has, from experience during the late war, become a matter of popular knowledge, that wounds in such parts of the body are not, of necessity, fatal, and where death does not at once result, it can only be foretold by the careful examination of a person of skill in such matters.

It is very clear that this evidence did not authorize the court to admit the statements of Petri. There is no proof that the deceased regarded himself as at the point of death. The wounds did not authorize such a conclusion. The fact that he did die at the close of the next day is certainly not sufficient. After the wounds were received, the deceased followed Morgan with his gun for a quarter of a mile and until he lost sight of him. Certainly he did not regard himself as a dying man when in that pursuit; and within an hour after the wounds, is it not an unfair presumption to assume that he felt in the hands of death?—death immediate and inevitable? In the language already quoted, the proof must clearly show that the declarant was in fact at the very point of death, and that he "was fully conscious of that fact, not as a thing of surmise and conjecture or apprehension, but as a fixed and inevitable fact." We all

Morgan *v*. The State.

know how readily from the lips of the sick and the suffering, come the words, oft repeated, "I shall never recover," "I shall die," when no real expectation exists of such a result. Any one who has stood by the bedside of the ill and heard these words, if at last the attending physician pronounced the fatal sentence, "you must die," knows the change that came over the face of the sufferer. The light fades from the eye, and the flush from the cheek, as hope for the first time deserts the patient. Such expressions of mere impatience and restlessness are not a sufficient foundation for a court to rest a safe conclusion upon as to the actual condition of the speaker's mind. Far from clearly establishing the fact that all hope has fled and that immediate dissolution is expected, they can hardly be said to create a presumption that such is the actual condition of the mind.

It seems impossible to deny that the court committed error in allowing the statements of Petri to go to the jury as dying declarations.

This error having occurred, did it harm the appellant? The presumption is that it did; and unless it clearly appears that it did not, we must reverse the case. Indeed, the only ground upon which this error can be treated as harmless is, that subsequent testimony supplied the defective proof and justified the action already taken by the court.

In the course of his examination in chief, Charles May stated, that he was a brother-in-law of the deceased; that when he saw him on Sunday afternoon he asked him, "What's the matter?" Petri answered, "Charley, I am in a bad fix; go for a doctor." "I went for a doctor; got a doctor and went home; went and saw him again. He told me that he believed he would die. This was Sunday afternoon. John told me an hour before that he would die." Moritz Hosmour testified, that Petri told him, "he had given up all hopes." This was about two o'clock Sunday afternoon.

Dr. Armstrong testified, that he saw Petri about three

o'clock Sunday afternoon. He called again at five o'clock, and at eleven o'clock at night, and the next morning at five; and the last visit was made at three o'clock Monday afternoon. He states, "I do not remember whether he said he was in fear of dying or not. The character of the wound led me to believe it would prove fatal. I was not satisfied that it would prove so, at my first sight. It is hard to determine how long it may be before a wound may terminate fatally. Sloughing produces secondary hemorrhage."

In this evidence we have the statement of Petri, that he "had given up all hope," and yet with this comes his call for a physician; and though not much is to be rested upon this fact, still it may not be unreasonable to infer that some hope of aid still existed. Then, too, the physician who examined him at three o'clock cannot recall that Petri even expressed a fear of dying, nor was the doctor himself enabled to determine the condition of his patient. And can it be supposed that under such circumstances the physician gave his patient no encouragement—animated him with no hope, while his friends were about him? This seems to fall far short of the proof required.

In *Rex* v. *Crockett*, 4 Car. & P. 544, the surgeon testified, "I had told the deceased she would not recover, and she was perfectly aware of her danger. I told her I understood she had taken something. She said she had, and that damned man had poisoned her. I asked what man, and she said Crockett. She said, she hoped I would do what I could for her, for the sake of her family. I told her there was no chance of her recovery." Bosanquet, J., said, "This shows a degree of hope in her mind. To render a declaration of this kind admissible, the deceased must have had the impression on her mind of an almost immediate dissolution."

Giving full weight to the after fact, that Petri did die about six o'clock on Monday evening, would it be reasonable to assert from the evidence, that it clearly appears that he apprehended even, much less was absolutely assured of

immediate death? In *Rex* v. *Van Butchell*, 3 Car. & P. 629, the deceased declared to his surgeon that he had such an injury in the bowels (having been operated on by a quack) that he would never recover. The surgeon endeavored to encourage him, really thinking him not in danger of dying, but he persisted in saying he felt satisfied he should never recover. HULLOCK, B., rejected the proposed declaration as evidence.

In the case of *The King* v. *Spilsbury*, 7 Car. & P. 187, it was proposed to give in evidence the dying declaration of a deceased person, and it was proved, that about the time of making the declaration, the deceased was asked, if he thought he should recover and how he was; to which he answered that he thought he should not recover, as he was so very ill. He had been previously insensible, but remained sensible for an hour and died the next day. The evidence was rejected by COLERIDGE, J., on the ground that he did not feel fully convinced that the deceased had no hope of recovery.

In *Regina* v. *Megson*, 9 Car. & P. 418, in a case of murder, it appeared that two days before the death of the deceased, the surgeon told her that she was in a very precarious state; and that on the day before her death, when she had become much worse, she said to the surgeon, that she found herself growing worse and that she had been in hopes she would have got better, but as she was getting worse she thought it her duty to mention what had taken place. Immediately after this she made a statement. ROLFE, B., said, "I think it does not sufficiently appear that the deceased was without hope of recovery. I think that I ought not to receive the evidence."

In the case of *Rex* v. *Bonner*, 6 Car. & P. 386, cited in the dissenting opinion, it will be observed that PATTESON, J., states of the person who made the declaration, "It is quite clear that he did not expect to survive the accident; and it is evident that he thought on the Wednesday that he might die on that day." As the statement was made on Wednes-

day when under expectation of death that day, the case seems to come within the rule.

But the cases we have cited establish the rule and exhibit the extreme caution observed by courts of the highest reputation in restricting evidence within its limits. The reason of this strictness is evident. The inevitable condition of the wounded sufferer, the natural inclination to justify one's own conduct, the disposition to condemn another as the cause of one's suffering, the presence of sympathizing friends, the strong sense of wrong and outrage, the feelings of anger and revenge—all these are not calculated to induce a calm, true, unbiased statement from the injured party. To overcome these, there is not even the sanctity of an oath; nothing, indeed, but the certain looking for of death, inevitable and immediate. This alone can be looked to as securing truth, when there is no oath, no cross examination, no confronting of witnesses.

The only safe rule for the admission of such declarations is, that the declarant must be fully persuaded that death is rapidly approaching; that it is so near that all motives to falsehood are superseded by the strongest motives to strict veracity; and that the proof render this condition of the mind clear to the judge before whom it is offered. And as the chief value of the law rests in its faithful administration, this rule cannot bend to cases of seeming hardship. In the present instance, the State has the declarations of the deceased made a few hours before his death, when the physician states he was in a dying condition.

The statements made on Sunday afternoon should have been rejected.

The appellant presents a bill of exceptions containing the instructions given by the court to the jury. The only statements in regard to the punishment to be inflicted in the event of a conviction for murder in the first degree are contained in the following instruction:

"Murder in the first degree is defined as follows: 'Sec. 2. If any person of sound mind shall purposely and with pre-

meditated malice, or in the perpetration, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison, or causing the same to be done, kill any human being, such person shall be declared guilty of murder in the first degree, and upon conviction thereof shall suffer death.' The only portion of the section applicable to the case now under consideration is embraced in the following words, to wit: 'If any person of sound mind shall purposely and with premeditated malice, kill any human being, such person shall be deemed guilty of murder in the first degree, and upon conviction thereof shall suffer death.' "

The appellant insists that the jury should have been informed that the statute provides, that "any person convicted of treason, or murder in the first degree, may instead of being sentenced to death, in the discretion of the jury, be imprisoned in the state prison during life." 2 G. & H. 437, sec. 4. The record, however, shows that the exceptions were taken by presenting the bill of exceptions pending the motion for a new trial; and as there is a question made whether this can be regarded as at the proper time, within the provisions of the statute on the subject in criminal cases, we do not *discuss the* question, as the case must be reversed for the error in admitting the statements of Petri made on Sunday afternoon.*

Judgment reversed, and cause remanded for a new trial.

GREGORY, J.—I am very clear that the judgment in this case ought to be affirmed.

The facts, in my opinion, make a case of murder in the first degree, and are of a character to justify the infliction of the highest penalty of the law.

---

*NOTE, by RAY, J.—Since the above opinion was filed, it has been brought to our notice, by the submission of the original record in this case, that the bill of exceptions presented by the transcript does not include all the instructions given by the court below, and that among the omitted instructions was one properly informing the jury as to the punishment authorized by law for murder in the first degree. We make this statement in justice to the learned judge who presided below, although the information reaches us in such form that we cannot officially recognize the fact.

The defendant entered the house of the deceased and committed a felony, was detected after perpetrating the crime, and to enable him to make his escape, he shot the deceased with a revolver, with which he was armed, inflicting a mortal wound, of which the deceased died in about twenty-nine hours.

I differ with the majority on the application of the rule as to the dying declarations.

The deceased was shot through the body and also in the jaw; in a struggle with the prisoner he had bled freely from his wounds; he had pursued the appellant for about a quarter of a mile, had returned to his house, and was in bed; he sent for a doctor; he said he was in a bad fix, that he thought he should die, that he had given up all hope.

The medical witnesses concurred in saying that the wounds were mortal. It is true, that the attendant physician was not clear in his mind at his first visit that the wounds were mortal, but he became satisfied the same day that they were so. It is very clear to my mind that the deceased, at the time he made the declarations introduced in evidence, was laboring under apprehension of almost immediate death.

In *Rex* v. *Bonner*, 6 C. & P. 386 (25 E. C. L. 487), the deceased had met with an accident, which happened about two o'clock on the morning of Sunday, the 11th of August, 1833. The surgeon stated that he attended the deceased on Sunday, the 11th, when he found him with six ribs broken, and other injuries; that he informed the deceased that he could not expect to recover. Beavan (the deceased) replied, that he was aware he must go out of the world unless he was relieved by medicine; that he was better on Monday, but passed a very bad night on Tuesday; and that on Wednesday he was very ill, and said he was satisfied that he must go out of the world. A clergyman also stated, that the deceased told him on Wednesday, that he did not expect to live. A brother and a son-in-law of the deceased also stated, that they were sent for by the deceased and saw

him on the Wednesday, when he expressed his great anxiety to settle his worldly affairs, as he had not long to live. He died on the following Saturday. It was contended for the prisoner, that the fact that the deceased did on the Sunday express himself in terms which clearly showed that he hoped to recover, and the fact that he did live until the Saturday, made the dying declarations not receivable in evidence.

• PATTESON, J., (who tried the case) said, "I think that I am bound to admit the declarations of the deceased. It is quite clear that he did not expect to survive the accident; and it is evident that he thought on the Wednesday that he might die on that day. *It is not necessary to prove expressions of apprehension of immediate danger;* and the circumstance that he lived until Saturday did not alter the state of things on the Wednesday."

In the case under consideration, the nature of the wounds, the declarations of the deceased, and the short time he lived, were all matters to be considered in determining the question as to whether he was laboring under the apprehension of "almost immediate death." Under the rulings in all the cases on this subject, if it had been proved to the satisfaction of the judge trying the case that the deceased was, at the time he made the declarations in question, laboring under the apprehension that he would die within the then next twenty-eight hours, then they would undoubtedly have been proper testimony to go to the jury.

The nature of the injury, the short time the deceased lived, his expressions, that he "did not expect to recover," "that he had given up all hope," satisfy me that the court below committed no error in admitting the evidence. Indeed, I do not see, under the rulings, how the court could have done otherwise.

The rule is a reasonable one, and is as old as the common law; it only applies to cases of homicide. The felon by whose unlawful act the tongue of his victim has been silenced in death has no great right to complain.

There is no reason why the rule should be so restricted in its application as to make it of little or no practical use.

I am of opinion that the instructions of the court to the jury are not properly in the record.

Of course, when I say that the judgment ought to be affirmed, it is in view of the legal presumption that the court properly directed the jury as to the law of the case.

*T. J. Forest, W. E. McLean,* and — *Simpson,* for appellant.

*D. E. Williamson,* Attorney General, *B. W. Hanna, J. P. Baird, D. W. Voorhees,* and *J. M. Allen,* for the State.

See note on page 521, POST.