Frazer, J.
This was an indictment for murder, tried in the Marion Criminal Circuit Court. The first question which presents itself for consideration is, whether that court possessed a constitutional existence when this cause was tried and the judgment rendered, it being prior to the act of May 13th, 1869, defining the tenure of office of the judge thereof and legalizing previous proceedings of the court. See Acts 1869, Spec. Sess., p. 52.
If it is within the scope of legislative power to legalize and make valid the proceedings and judgments of a court which it was not within the authority of the .legislature to ■create in the first instance, the act alluded to would obviate the question in hand; for it is ample in its terms to cure everything. We are not prepared, however, to say that a constitutional prohibition oould be thus evaded, and cannot therefore dispose of the inquiry in that way.
We have heretofore had occasion to consider whether the legislation by which the criminal circuit court was created was in conformity with the constitution, and we resolved it in the affirmative. Combs v. The State, 26 Ind. 98; Anderson v. The State, 28 Ind. 22. But we were not, in those cases, aided by that fullness of argument with which the question is now presented; and, indeed, its chief difficulties were .not then suggested by counsel and did not occur to us,-and, of course, were not considered. We never meant to hold that in the creation of the circuits provided for in art. 7, sec. 9, of the State constitution, one circuit could be formed within the territory allotted to .another, or that the criminal circuit court is the circuit court contemplated by sees. 1, 8, and 13 of that article.
The power to create courts inferior to the circuit court is expressly given. Art. 7, sec. 1. And the authority to pass laws for that purpose, local to one or more counties, whose circumstances require them, when such laws, if of uniform operation throughout the whole State, would be elsewhere mischievous, useless, or burdensome, is equally clear. Art. 4, sec. 23. It is ordinarily a question .of fact *422 whether a law of uniform operation can be properly applied to accomplish a given end, which is desirable-for some localities; and in Gentile v. The State, 29 Ind. 409, we held, upon very mature consideration, that in such a ease, the decision of the legislature upon that question of fact Is not subject to review by the courts. But In any event, when the judicial business of one county requires; these courts to be in session almost constantly, that justice may be administered without delay, as the constitution enjoins, Avhile in each of fifty other counties a single court can transact the-whole business by sitting a few weeks, in each year; it is not’ a proposition 'open to. debate, either In the legislature or here, that Such laws as to the creation of courts as the necessities of the one county require cannot in any reasonable sense be made applicable to the fifty counties. Such senseless uniformity as that upon that subject Is not required either by the letter or- spirit of the constitution.
The inapt name, “ Criminal Circuit Court,” determines nothing as to the character of the tribunal. We learn that from the jurisdiction with which the law has Invested it.. That jurisdiction is confined tp criminal causes, while the circuit courts generally possess an extended jurisdiction, both civil and criminal. The criminal court is inferior' comparatively, and it is therefore an inferior court in the same sense that the court of common pleas, is such ; and if' the creation of the latter; with Its present extensive, jurisdiction, is warranted by the constitution, the criminal court has the sanction also of that Instrument. It matters not that the act defining its jurisdiction attempts to deprive the Circuit Court, of Marion county ©f all criminal jurisdiction,, even assuming that it was.not contemplated to circumscribe the jurisdiction of that court within a limit not applied to all the circuit courts. See Acts 186.5., Spec. Sess., p. 150, sec. 5. This could not affect the existence of the criminal court in any sense; the worst possible result would be that the-Marion Circuit Court still possesses, though not exclusively, its, former criminal jurisdictionand it, is. not, necessary ira *423 the present case, to express any further opinion concerning it. An entire act is not ordinarily vitiated by the unconstitutionality of a single section; so much as is in harmony with the fundamental law will stand. Nor does it seem to us of any consequence to the case before us, that in creating the court, the legislaure should have attempted the novel and unnecessary thing of creating a circuit within a circuit. See id. 153, sec. 1. This act, nevertheless, creates a criminal court for Marion county, and it can do no harm that, for such a purpose only, the county was called the sixteenth judicial circuit. Much of the doubt which the profession has entertained as to the valid existence of the court has had its origin in this feature of the act and in the name given to the court. These things tend to confusion, it is true, but the court must be judged by its powers; and when these are referred to, it is not possible to confound the criminal court with the circuit court contemplated by the constitution and created in pursuance of its provisions.
There remains, however, an argument against the existence of the criminal court which has seemed to us more formidable than any other. The legislature had not, until after the trial of this cause, fixed the duration of the term of office of the judge of the criminal court, though it provided for his election. In the absence of a provision of the constitution upon the subject, the tenure of the office would have been without limit as to time, unless at a subsequent time a limit had been fixed. But art. 15, sec. 2, declares that “the G-eneral Assembly shall not create any office, the tenure of which shall be longer than four years.” The question is as to the application of this restriction. Does it in the case in hand render the creation of the office a void act? If so, then the court was without a judge, there was no warrant of law to elect or appoint one, and there could be no such officer defacto, much less de jure; and, of course, it would follow that all the proceedings of the court were utterly void. But we are of opinion that the restriction cannot be held to apply where, as in this case, no tenure is fixed. The pre *424 ceding part of the section provides, that “when the duration of any office is not provided for by this constitution it may be declared by law; and, if not so declared, such office shall be held during the pleasure of the authority making the appointment.” This language seems to be conclusive in support of the position that an office may be created by law though its duration be not fixed, as in this case. If fixed at a longer term than four years by the act creating it, there would then be a question whether the creation of the office was not void, or whether valid, but its tenure limited to four years by force of the constitution. But no such thing was attempted in the present instance. Here the office was created; its duration was not fixed; and by the express letter of the constitution it would continue, "for the time being, during the pleasure of the authority making the appointment. The office was created by valid legislation, and no question is presented by this record concerning the right of the particular person exercising its functions.
Upon the whole, then, after the fullest deliberation, we reach the conclusion that the Marion Criminal Court was at the time of the trial a valid tribunal, lawfully existing— a court inferior to the circuit court contemplated by the constitution, with jurisdiction to try this cause.
The next question presented is as to the sufficiency of the first plea in abatement, by which it was averred that on a certain day of the term the grand jury was discharged until a certain future day; that it did not appear on that day, but upon the day after; and that without being re-impanelled it subsequently found and returned this indictment. It is contended that by its failure to appear at the time appointed, the grand jury was dissolved; and that the indictment was therefore not returned by a lawful grand jury, duly impanelled. No authority is cited in support of this position, nor are we aware of any. Nor does it seem to us to be sustained by any sound reason. We are not prepared to hold that by disregarding a proper order of court, a grand jury can dissolve itself. We are of opinion, there *425 fore, that the court below did not err in sustaining a demurrer to this plea.
There was a demurrer also sustained to a second plea in abatement, and this is assigned for error. This plea alleges that it appears by the records of the court as follows: that the indictment was returned on the 20th of October, 1868; that the grand jury were in session on the 29th of September, and thereafter continuously until said 20th of October; and that there was no entry of record showing an adjournment or discharge of the grand jury between the days aforesaid. This plea was intended to rest upon the act of 1865 (Spec. Sess., 156), which provides that in the criminal court the grand jury shall not sit more than ten days in each month. We think the plea bad, because it does not aver facts, but merely that certain things appear by the records of the court. This merely states evidence of the fact relied on, without averring the fact itself, that the grand jury had been in session in the month of October for more than ten days before returning the indictment. It might well be that the existing record was as alleged, and yet that in truth the grand jury had not been sitting in October ten days before retnrning the bill. A record in evidence imports absolute verity, it is true, but sometimes orders are omitted by clerical mistake, which may be subsequently supplied. So that there is reason for the rule, even in such a case, that the plea should show, not what the evidence is, but what the fact is.
In Anderson v. The State, 28 Ind. 22, we held, that upon an application for a change of venue to another county upon the ground of local prejudice, it was not error to receive counter affidavits. This was followed in Morgan v. The State, 31 Ind. 193. The question is again presented, and we adhere to the ruling. We are of opinion, too, that in this case the motion for the change was correctly overruled.
Two jurors had formed what they called “a partial opinion” of the case, from reading newspaper accounts of the facts and from rumor, and one of them had expressed that *426 opinion. It further appeared that this partial opinion was a mere impression, not made up from conversations with witnesses, and theythought that if sworn as jurors it would have no influence upon them, that they could act solely upon the evidence offered upon the trial. It is evident, indeed, that they had no fixed opinion upon which they rested. A challenge for cause to each juror was refused, and the question is presented here. It is in no material respect different from the inquiry as presented in Fahnestock v. The State, 23 Ind. 231, and Morgan v. The State, 31 Ind. 193, where we held, as, indeed, had been previously decided in several other cases, that the j urorwas competent. It may be regarded as' settled, that the opinion which, under our statute, renders a juror incompetent is not that vague and unsatisfactory impression which the mind receives at second hand, and which vanishes in the presence of authentic testimony, and upon which no man of common sense would take responsible action. If it were otherwise, in this age of newspaper enterprise, when the particulars of every startling event are so speedily and generally carried into almost every family, intelligent men would usually be incompetent jurors, and ignorance would be the essential qualification to try the gravest criminal causes.
Upon a motion for a new trial, affidavits were read to the effect that one of the jurors thus challenged, Moore, had before he was sworn as a juror said, “that from all appearances he believed Mrs. Clem guilty.” One of these affidavits, however, stated that the conversation was in a jocular manner, and did not at the time impress the affiant as being spoken sincérely. Moore himself by affidavit admitted, as he had virtually done before being sworn as a juror, that he might have said if what he had heard was true, he believed her guilty, but nothing more. All this amounted to very little, and certainly afforded no sufficient reason for a new trial. The opinion expressed was hypothetical, and did not disqualify the juror.
A similar affidavit was read, made by one Alhand, to the *427 effect that Vance, another juror, had, before being sworn as a juror, declared his belief of the defendant’s guilt. But Vance explictly denied this under oath, and three others' made oath that Alhand’s character for truth and veracity and his general moral character were bad. The subject, so far as relates to the juror Vance, certainly needs no discussion.
So as to the jurors 'Wilson and Stokely. There is an affidavit as to each, stating the prior expression of an opinion of guilt, which each of those jurors flatly denies by counter affidavit. We cannot say that the court below erred in determining the question of veracity thus presented.
Evidence of the general good character of a witness for the State was allowed, over the defendant’s objection, after the defense had impeached the witness by proof of statements made by him contradictory of the facts to which he had testified. This action of the court below was in accordance with the decision of this court in Clark v. Bond, 29 Ind. 555, which we are asked to reconsider. The sole object in asking a witness whether he had made statements elsewhere not in accordance with his testimony, and upon his denial, calling other witnesses to show that he did make such statements, is to create the belief that, he is not a credible witness. Impeachment of a witness by proof of his bad character is intended to accomplish exactly and only the same thing. The statements and the bad character are alike immaterial, except for the single purpose of affectingthe credit of the witness, and it is not easy to say that the two methods are not about equally efficient in accomplishing the end. In either'case, the credibility of the witness is impaired; nor is this incidental, as in the case of a contradiction between witnesses as to a material fact. If it is just in the one case that a party should be permitted to establish the credit of his witness by showing his good character, it is alike just in the other case. The sole question in each is, what credit should be given to the impeached witness ? And any distinction between them as to the kind of evidence allowable, or which admits it in one ease and excludes it in 'the other, is *428 technical, and, it seems to us, without any foundation in justice, and is not even supported by the argument of convenience. Though in Massachusetts, New York, Pennsylvania, and perhaps in Connecticut, it is held that to meet such an impeachment, evidence of good character is not admissible, the contrary rule is stated by both Phillipps and Groenleaf, and is held in Vermont and Alabama. State v. Roe, 12 Vt. 93; Hadjo v. Gooden, 13 Ala. 718. In Rex v. Clarke, 2 Stark. 241, the court went still further, admitting evidence of a particular fact to support a witness shown on cross examination to have been convicted of larceny. The evidence admitted was, that she had received a reward for subsequent good conduct; and it was put by the court upon the ground that her character had been impeached and might be thus supported. If so, it would seem less questionable that proof of good general character would have been admissible. In Brown v. Mooers, 6 Gray, 451, it was said that the statement in Greenleaf “is not law,” though the case did not, as we think, call for any opinion upon the subject, as there had been only an attempt, which failed, to prove the contradictory statements. It seems however, that, in that court, it is held that an unsuccessful attempt to impeach by general evidence of bad character opens the door to the other side to put in general evidence of good character (Comm. v. Ingraham, 7 Gray, 46), a proposition which would hardly receive assent elsewhere. There are other peculiarities in the rulings in that state upon the general subject of impeachment, not at all accordant with what is understood to be the law in England and in most of the states of the Union. See Tucker v. Welsh, 17 Mass. 160. It seems to be made easy there to impeach by proof of contradictory statements, though it is rendered difficult to repel the attack; while impeachment by assault upon general character is rendered perilous to the party who even attempts it. It does not seem to us that the discrimination is well founded, nor that its tendency can be favorable to the attainment of just results in practice. We are well *429 satisfied to adhere to the ruling upon the subject as made in Clark v. Bond, supra, though we have felt it due, as well to the importance of the present case as to the high character of the courts which have held otherwise, to give the subject a more extended discussion than was done at that time.
Objection was made by the appellant to evidence of her prior extensive financial transactions with banks and individuals; but the evidence was admitted. There was no error in this. The tendency of this, in connection with evidence of her business transactions with Jacob Young, who it appeared had been murdered at the same time with his wife, Nancy J. Young, was to show that the defendant had a strong motive of gain as well as reputation to be sub-served by the homicide and destruction of papers supposed to have been upon Young’s person at the time.
A double-barrelled gun was found near the dead bodies, one barrel of which was yet charged, the other being empty. The victims had been shot. The State offered to prove the purchase of this gun by the co-defendant Abrams, on the morning of the day upon which the murder was committed, and was allowed to do so against the objection of the appellant that the acts of an alleged conspirator with her could not be shown against her, in advance of any evidence showing such conspiracy. The rule of law relied upon to sustain the objection seems not to be inflexible. Mr. Green-leaf says that it is in the discretion of the court under particular and urgent circumstances, for convenience, the prosecutor undertaking to furnish such proof afterwards. 1 Greenl. Ev., sec. 111; 3 id. sec. 92. But in this case, the evidence offered tended to prove the conspiracy itself, by connecting Abrams with the crime. It was a link in the chain of circumstances by which that fact was supported. It would ordinarily be impossible to show a conspiracy save by the acts of the various persons engaged in it. It would be rare, indeed, that the acts and declarations of one only would show the connection of the others. See 3 Greenl. Ev., sec. 94.
Parol evidence of what the defendant directed a witness *430 to enter in a book of accounts was admitted over her objection. The evidence related to her financial transactions, and was not irrelevant, as we have already seen. But it is urged that the parol evidence was an improper method of proving what the book contained. It seems sufficient to say that the evidence tended, not to prove the entry made, but merely what the defendant directed. It was not secondary, but original evidence.
We are urged to reverse the case upon the evidence. There was so much evidence of guilt that our interference with the verdict upon this ground is out of the question.
The correctness of several of the instructions given by the court to the jury is called in question. These instractions, thirty-three in number, wei’e applicable to the case, and were, in the main, not only unobjectionable, but a very clear, correct, and careful statement of the law. Most of the objections made to them are not of such a nature as to justify the labor and space which would be required to discuss them in detail. Such as are not specified in this opinion have been carefully considered, however, and we are of opinion that they are not well taken.
The fifteenth instruction was as follows: “If all the circumstances of a criminative character which have been proved are subject, to explanation upon any reasonable hypothesis consistent with the innocence of the prisoner, she is entitled to the benefit of such explanation. So, if it should be that you should have no reasonable doubt from the evidence that Silas Hartman, either by himself or in connection with others, not including the prisoner, perpetrated the murder, and should have a reasonable doubt whether the only connection the prisoner had with the transaction was to harbor, conceal, or assist Silas Hartman, her bi’other, after the perpetration of the deed, with the intent that he should escape detection or punishment, she would not be guilty of any crime under the law. But if she was present at the time and place of the murder, in any way assisting, aiding, encouraging, or contributing to *431 wards the murder, she would be guilty as a principal in the crime. So, if the murder toas perpetrated with her knowledge and consent or connivance, she is a principal'.”
Question is made as to the correctness of the last clause of this instruction.
"When the jury was told, that if the defendant “was present at the time and place of the murder, in any way assisting, aiding, encouraging, or contributing towards the murder, she would be guilty as a principal in the crime” language was employed embracing every possible case in which she could be guilty as a principal in the second degree. The definition given was full and exhaustive. Nothing could be added to it without error, though it might properly enough be illustrated and explained, that the jury might understand fully the meaning of the language employed, and how to apply it to the facts of the case on trial. This, if done correctly, might be an aid to the jury, and would bo entirely unobjectionable.
This definition is immediately followed by the clause to which objection is urged. It is suggested that it is introduced by way of addition, and not as if for the purpose of an explanation of what had preceded it. The language does not necessarily imply this, though it might be so understood — “So, if the murder was perpetrated with her knowledge and consent or connivance, she is a principal.” The terms “hence” and “therefore” are sometimes the equivalents of “so,” and the latter word is thus understood whenever what follows is an illustration of or conclusion from what has gone before. It remains to consider whether the proposition that if a murder be committed in one’s presence and with his consent, such an one has aided and abetted, and is therefore guilty as a principal, or, in other words, is, according to the old law, an accessory at the fact.
Consent, as a substantive, is the synonym of assent, acquiescence, concurrence, and means an agreement or harmony of opinion or sentiment; and so it would here be popularly understood. It does not imply any manifesta *432 tion or expression of such concurrence, though this may sometimos bo inferred from the connection in which the word is used. There was, however, nothing here to suggest this implication. It could exist without act or utterance, and entirely without the knowledge of the actual perpetrator of the homicide, and in that case it would neither aid nor encourage him to do the fatal deed; and short of this there cannot be aiding or abetting in the sense which the law requires to constitute guilt as a principal in the second degree. Under this instruction, the jury would understand that if they believed from the evidence that the prisoner was present when the murder was committed, and was willing or desirous that the bloody deed should be done, they must find her guilty, though that desire had been kept by her a secret, and was entirely unknown to him who inflicted the deadly blow.
It is plainly not the law that one can be guilty of murder without overt act, who by neither word nor gesture has done anything to contribute to the commission of the homicide or to assist, encourage, or evince approval of it at or before the fact, and of whom it only appears that he was present and knew of the crime and mentally approved it. The silent thought, however wicked in view of the Searcher of Hearts, is not a crime against our laws, but is left by them to another than a human tribunal.
And yet this word consent has been used loosely by distinguished sages of the law, in a sense implying more than its proper or its popular import, and doubtless in the same sense in which the learned judge below really intended it to be understood. Thus, Mr. Chitty (1 Crim. Law, 256), “The stroke is constructively given by all who consent to it.” And Sir Michael Foster, in M’Daniel's Case (Foster’s C. C. 127), “Persons procuring, contriving, or consenting, come within the words aid and command.” And again in his learned discourse on accomplices (id. 346 and 351). Also Hale’s P. C. 374 and 618. The authorities which they cite in support clearly show the sense in which they use this language to *433 be as we have stated it. No case can be found in all the books to warrant these passages in their most literal, natural, and popular sense.
But if Chitty, Hale, and Foster have employed this word as implying not merely acquiescense of mind, but also the manifestation of it, it does not follow that it can be employed in an instruction to the jury without error. The j ury would understand the language addressed to them in its ordinary sense; and thus understood, if it did not give the law correct!y, there would be obvious error.
Reversed, and remanded for a new trial.