## JONES v. THE STATE.

### No. 8909.

CRIMINAL LAW.—*Murder.*—*Evidence.*—*Dying Declarations — When Admissible.*—On the trial of a defendant indicted for murder, the dying declarations of the deceased are admissible in evidence when it clearly appears, that, at the time they were made, he had no hope whatever of recovery, and was fully persuaded that death was rapidly approaching; nor does the fact that the deceased lingered several days thereafter render such declarations inadmissible.

SAME.—The facts, that the deceased, at the time such declarations were made, was unable to speak intelligibly, on account of his wound, which was in the mouth, but communicated by signs or by writing, and was able to get out of bed, go to a window and explain the situation when injured, and go back without assistance, are not valid objections to the admissibility of such declarations.

SAME —Where such declarations are communicated by signs to one, and reduced to writing by another, but afterward read over to and signed by the deceased, who said they were correct, such written statement is competent evidence to go to a jury.

SAME.—*Threats can not be Proved by Dying Declarations.*—Previous threats by the defendant against the deceased are not subject to proof by the deceased's dying declarations; but the admissibility in evidence of the resi-

due of the written statement containing such dying declarations is not destroyed because it contained a clause 'stating such threats, which had been stricken out before it was permitted to be read in evidence. But the defendant would be entitled to have the whole statement read if he so desired.

SAME.—*Declarations of Deceased.—Res Gestæ.*—Statements made by the deceased, not contemporaneously with, but a few minutes after, the transaction, as to who inflicted the injury, are not admissible as part of the *res gestæ*, and the length of time between the main fact and the statements can not be important, if such time elapsed as to make the statements, having regard to their form and substance, merely narrative.

SAME.-*Evidence.—Witnesses.-Experiments by.--Expert.-*The question whether the deceased, seated at or near the window through which he was shot, could have seen and recognized the person on the outside who inflicted the wound, is not one of skill or science, but one which it was the province of the jury to determine from the evidence as to the circumstances and condition of things at the house at the time of the transaction; and experiments made by others elsewhere, and the results thereof, and opinions founded thereon, are not competent evidence to prove such question.

From the Posey Circuit Court.

*M. W. Pearse* and *G. V. Menzies*, for appellant.

*D. P. Baldwin*, Attorney General, *W. H. Gudgell*, Prosecuting Attorney, and *W. P. Edson*, for the State.

WORDEN, J.—Prince Jones, the appellant, was indicted in the court below, for the murder of James Pigg, and upon trial was convicted and sentenced to imprisonment for life in the state-prison.

At the proper time, he moved for a new trial, and filed written reasons therefor, but his motion was overruled, and he excepted.

The homicide was perpetrated at what is called in the the evidence the Mutz farm, by shooting with a fire-arm loaded with small balls or buck-shot. The deceased, on the evening of February 5th, 1880, between six and seven o'clock, with other persons, was sitting in a house upon the farm mentioned, near a window, when some one approached from the outside and discharged the fire-arm through the window, breaking the glass, the balls or buck-

shot taking effect upon the person of the deceased, wounding him as hereinafter described. The deceased died of the wound thus inflicted, on the 19th day of that month.

Among the causes assigned for a new trial was the admission, over the exception of the appellant, of certain evidence as the dying declarations of the deceased. There were two papers, prepared on the same day, given in evidence, as such dying declarations; and it is earnestly insisted by the counsel for appellant, that it was not sufficiently shown that the deceased was *in extremis*, and entirely conscious of the fact, at the time the declarations were made, and, therefore, that the admission of the evidence was erroneous.

We set out the evidence bearing upon the point.

S. H. Pearse testified: "I have been practicing medicine twenty-six years. I went to see Jim Pigg, on the night he was brought to town. The wound was at the angle of the mouth, on the right side; took out a portion of the upper jaw, nearly severing the tongue, and taking out portion of jaw on left side; took out teeth and bullets from underneath jaw on left side; the balls took portion of the bone of upper jaw on right side, carried across the mouth and lodged under the angle of the jaw on the left side. The shot struck upper jaw in front and ranged downwards and backwards, and were lodged under on the opposite side. The bullets taken out were about the size of buck-shot. From appearance of the wound, the muzzle of the gun must have been close, as Pigg was powder-burnt. I saw three balls taken out close together, and lodged close together.    *    *    * Pigg was shot on the 5th and died on the 19th day of February, 1880, in Posey county, Indiana. My opinion was from the first time I saw him, he would die; we could not tell how long he might live; did not know how much vitality he had, but thought he would die. We

could not give any opinion as to how long he would live. Saw him nearly every day. I don't know that I heard Pigg say any thing; he could not talk; only wrote. I don't know who was present when he did the writing. The substance was a question as to what we thought would be the result—whether we thought he had any hope of recov ery. We told him there was no hope. Never heard Pigg express any hope at all. Never saw any thing written by Pigg in regard to his hope or condition. Was there every day but one or two. Some medicine was given him. I saw him the day after he was shot; he couldn't talk then; don't think he could articulate after he was wounded; I don't think, from the nature of the wound, he could have spoken a continuous sentence; he might have spoken words of one syllable before inflammation set in; he could not make sounds dependent upon the action of the tongue. He would get up and sit in a chair very frequently, to expectorate the pus.    *    *    *    The wound was necessarily mortal."

E. O. Spencer testified: "Practiced medicine twenty-nine years. Some party came to my house ten or eleven o'clock, night of February 5th, and reported Pigg shot. I did not go to see him that night; dressed the wound at four or five o'clock P. M. on the sixth. He was shot in the right side of mouth, close to the corner or angle of mouth; shot ranged backwards and downwards; struck upper jaw, took two or three upper teeth and some lower teeth out; segment of lower jaw broken and carried across the mouth, cutting off the tongue proper and fracturing the lower jaw on left side; under jaw all broken to pieces; the tongue hung by little part underneath. I took out two or three teeth and two bullets that evening. A few days before he died I took out another bullet; they were buck-shot. I thought he would die; never entertained any other idea; when I first saw him I thought he

would die in four or five hours, and I never saw him afterwards, when I thought he would live twelve hours. One day saw him only once; other days saw him twice. Asked him how he felt, if he was better; he shook his head and tried to say no. I made it a rule to ask him when I visited him, how he felt; always answered no; in no case did he say he was better. I visited him four or five times before the 8th of February; gave him medicine to try to make him easy; I gave him no medicine for any curative purpose. Could not say I explained to Pigg why I was giving him medicine; he objected to taking medicine; had to give it to him with a tube. * * * Pigg tried to talk, but couldn't say much; he could say no and yes, so I thought I could understand what he said."

Susan Pigg testified: "I am the widow of James Pigg; I was at home here in town, when he was shot. Don't know how long he had been out there; he went on Monday and came back and went down on Tuesday. I saw him on Friday evening after the shooting occurred. He said at that time he would never get well; every time I asked him he said the same; I asked him every two or three days. He lived about eighteen days. I don't know what white people were there. Loudon and Jackson were there February 8th, 1880. Just before they came I asked him did he think he would get well; he said 'never in this world.' The doctors came then until he died. I gave him medicine until he could take no more. Loudon and Jackson were there the first Sunday after he was shot. I asked him how he was, every day or two; asked him just before they came, about four o'clock in the evening. I don't know whether I asked him on Monday or Tuesday, or not. I did not know Loudon and Jackson were coming."

Walter Jackson testified: " Was at Pigg's house twice

on Sunday after he was shot, first time right after dinner, and again at 6 P. M. I heard Mr. Loudon ask him whether he thought he would get well, and he said no. Crunk and Loudon went with me. (Paper No. 1 shown to the witness.) I wrote the questions on this paper, and Pigg wrote the answers, on February 8th, 1880, about 1 o'clock P. M. (Paper No. 2 shown the witness.) I wrote the body of this paper, and Pigg signed his name to it, February 8th, 1880, about 6½ o'clock P. M. Pigg got up out of bed and went to the window, and explained the position he was in when shot. After I wrote out this paper, I read it to him and he signed it. He got out of bed without assistance, went to the window, and got back into bed without help from any one. Loudon asked the questions; he answered principally by yes and no, and by signs. I wrote the answers as Mr. Loudon gave them to me during the progress of the enquiry. He would ask the questions, Pigg would say yes or no, then I got it from Loudon. He would ask the questions, get the answers, and reduce it to a narrative form, and then I would write it down as it is here. The substance of his answers was that he did not think he would get well; thought he would die. I put it down as Loudon gave it to me. and not as Pigg said it or wrote it. This was the 8th of February, about dark. Never saw him any more. I went of my own accord. Doctor told me, if I wanted his dying declaration, I had better go and see him. Loudon explained to Pigg that we had come to take his dying statement. I read it to him. Mr. Loudon asked him if it was correct, and he said it was."

William Loudon testified: " I was at Pigg's on Sunday night after he was shot; went with Jackson. Pigg was lying in bed; seemed to be suffering a great deal. Pigg said, on two. or three occasions, in response to my questions, that he did not think he could get well. I asked

him several questions. He could not articulate plainly. Asked him several questions as to his condition. After I had asked him, he would indicate the answer, and, after a number of questions had been asked, the substance of the answers was reduced to writing by Jackson and read to him. He then raised up in bed and signed it. He said he understood what was read to him. After getting the answers, I put in form and gave it to Jackson. Sometimes two or three questions were asked, then I gave the substance to Jackson. We were there about half an hour. Nearly all the declaration was made up of signs, in answer to my questions. He made no independent statement in words. His statement was only by signs, in answer to my questions."

Alex. Crunk testified: " Was at Pigg's house Sunday night after he was shot. Pigg got up to the window, to show us how he was shot; said he did not think he would ever get well; he had but a short time to live. The questions were asked him who he thought shot him, and several other questions were asked. I heard paper No. 2 read to him, and saw him sign it."

The papers numbered one and two were then read to the jury, as follows:

"Paper No. 1.

" Did you see Prince Jones at the window when he shot you?

" I did. I am sure he is the man.

" Did you see him when he shot you?

" Yes."

"Paper No. 2.

" I, James Pigg, wish to make a statement in reference to the wound I received on Thursday, the 5th day of February, 1880, which wound I believe will speedily cause my death. I was setting by the window, inside the house, a little after dark, between six and seven o'clock. I cast my

eyes around toward the window, and I saw Prince Jones close to the window, and just as I saw him he fired through the window, the shot taking effect in the right side of my face. I could not see whether it was a gun or a pistol that Prince shot. I make this statement under the firm belief that I have but a few hours to live.

(Signed,) " JAMES PIGG.

" Attest: W. S. Jackson."

The rule on the subject of dying declarations, as stated by this court in *Morgan* v. *The State*, 31 Ind. 193-204, and followed in *Watson* v. *The State*, 63 Ind. 548, is as follows:

" The only safe rule for the admission of such declarations is, that the declarant must be fully persuaded that death is rapidly approaching; that it is so near that all motives to falsehood are superseded by the strongest motives to strict veracity; and that the proof render this condition of the mind clear to the judge before whom it is offered."

It seems to us that the declarations thus given in evidence were fairly admissible under the rule as above stated, as well as by the general current of authorities on the subject. See Wharton Crim. Ev., 8th ed., sections 276 to 304.

The evidence clearly enough showed, that, at the time the declarations were made, Pigg had no hope whatever of recovery. At the time of the declarations, he seems to have been conscious and fully persuaded that death was rapidly approaching. He had no hope or expectation of surviving the injury. We have no difficulty upon that point.

It seems also to us, that, at the time of the declarations, taking into consideration the extent and character of the wound, which eventually proved fatal, Pigg may well be regarded as having been *in extremis*, or *in articulo*

*mortis*, in the sense in which those terms are employed. The wound was mortal, and 'death therefrom rapidly approaching; so near, it would seem, that all motives to falsehood were superseded by the strongest motives to the strictest veracity. This is all that can be fairly meant by the phrases above mentioned. The declarations were made under a sense of impending dissolution, and the fact that the declarant lingered some eleven days after they were made can not render them inadmissible. At section 281 of the work on criminal evidence above quoted, it is said that " The declarant, to render his declarations admissible, must have uttered them under the sense of impending dissolution, and with a consciousness of the awful occasion, though the principle is not affected by the fact that death did not ensue until a considerable time after the declarations were made." See, also, section 286 and note.

In the case of *Commonwealth* v. *Cooper*, 5 Allen, 495, dying declarations were received where there was an interval of seventeen days between the declarations and the death of the declarant. The court said, quoting from CHIEF BARON POLLOCK, in the case of *Regina* v. *Reaney*, 7 Cox C. C. 209 :

" In order to render such a declaration admissible, it is necessary that it should be made under the apprehension of death. The books certainly speak of near approaching death ; but there is no case in which any particular interval, any number of hours or days, is specified as the limit. In truth, the question does not depend upon the length of interval between the death and declaration, but on the state of the man's mind at the time of making the declaration, and his belief that he is in a dying state."

In the case of *Swisher* v. *The Commonwealth*, 26 Grat. 963, the deceased was mortally wounded on the 8th of

January, 1875, and died on the 18th of the same month. It was held that his dying declarations, made on the night of the wound, were properly received in evidence. It may be remarked, that, in that case, the want of any hope or expectation of recovery was not, as it seems to us, as well made out as in the case before us.

The fact that the deceased was able, at the time the declarations were made, to get up out of bed, go to the window and explain the situation, and go back to bed without assistance, should not, as we think, exclude the declarations from the jury. We can not say that the exhibition of so much physical energy and strength is inconsistent with a firm conviction of impending death. The fact, however, was a proper one to be taken into consideration by the jury. It is said, in a note to section 281 of the work on evidence above cited, that "The determination of the question whether there was such a sense of impending dissolution is primarily for the court; but when the evidence is admitted this is properly a topic for the consideration of the jury under the directions of the court."

The fact that the deceased could not speak intelligibly, but communicated by writing or by signs, forms no objection to the admissibility of the declarations. *Commonwealth* v. *Casey*, 11 Cush. 417.

There are some objections to the two papers given in evidence, which detract from their value as evidence, but which do not, as we think, render them incompetent to go to the jury.

Paper No. 1 is very short, consisting of two questions only, and the answers thereto. Both questions assume that it was Prince Jones who shot the deceased, and the point of the enquiry was, whether the deceased saw him.

" Did you see Prince Jones at the window, when he shot you?" How far the answer to this question may

have been prompted by the assumption that it was Prince Jones who shot, can only be left to conjecture. The question was well calculated, to say the least of it, to suggest to the mind of the deceased that it was Prince Jones who shot; and it is impossible to say how far the suggestion may have influenced his answer. A much better way of arriving at the truth would have been to have asked the deceased if he saw the person who shot, and, if so, to have asked him who it was, if he knew.

Paper No. 2 seems to have been procured by Mr. Loudon, asking questions of the deceased and getting his answers, then reducing the statements into the form of a narrative, and in that form giving them to Mr. Jackson, who wrote them down as he received them from Mr. Loudon, and not as Pigg made the statements. This, to our minds, is not a very satisfactory mode of taking a dying declaration. In the paper, we have no question which was asked the deceased, or the answer given by him. What Mr. Loudon understood to be the effect of the answers of the deceased was communicated to Mr. Jackson in the form of a narrative, and by Mr. Jackson it was written down, producing the paper in question. It is apparent that if the questions asked by Mr. Loudon, and the answers thereto, had been written down as asked and answered, the jury would have been much better enabled to judge of the weight to which the statements of the deceased were entitled. This paper was read to Pigg, and he said it was correct, and signed it. We think it was competent to go to the jury.

Another point is made in reference to paper No. 2. As originally prepared, and as first offered in evidence, it contained the following clause: "On the Sunday previous, I had a fuss with Prince, and Prince threatened that he would kill me before a week." The defendant

objected to the introduction of the paper in evidence, because of this clause, and thereupon the court struck it out, and admitted the residue in evidence. This it is claimed was erroneous.

The supposed previous threats of the appellant were not the subject of proof by dying declarations, and the court did right in striking out the clause in question. To have admitted it would have been error. *Binns* v. *The State*, 46 Ind. 311.

But the appellant insists that, as the paper was a written document, signed by Pigg, it must have been given in evidence as an entirety, if at all ; and, as it could not have been given as an entirety, no part of it could have been given. We, however, do not concur in this view of the question. A written deposition, signed by the witness, may contain competent and incompetent testimony. The incompetent may be struck out, and the competent received. So, if, in this case, the dying declarations of Pigg had not been reduced to writing, but had been given in evidence orally, there can be no doubt that the competent portion might have been received, and the incompetent rejected.

We do not see that the case is changed by the fact that such declarations were reduced to writing. Doubtless, the appellant, had he desired it, would have been entitled to have the entire paper read to the jury, as one part might serve to explain, control or modify another.

If the deceased knew or believed that the appellant had made previous threats to kill him, the jury might have regarded this as a circumstance tending to make him confident that it was the appellant whom he saw at the window, and thereby raise some doubt as to whether he really recognized the appellant as stated. But the appellant did not desire that the paper should all be read.

He objected to the reading of the entire paper, on account of the objectionable clause. The court committed no error in striking it out and admitting the residue.

We proceed to the consideration of other questions in the cause.

The seventh reason for a new trial was, that the court had erred in allowing the following question to be put to, and the answer to be given by, James Howard, a witness introduced on behalf of the State, viz. : "What were the first words Pigg spoke after he was shot? Ans. He said Prince Jones shot him."

The eighth cause has relation to the same question put to, and the same answer given by, James Pigg, Jr. We set out enough of the testimony of those witnesses to present the question involved :

James Howard testified : "I knew James Pigg, and I know Prince Jones. I was at the Mutz farm on the 5th of February, 1880; saw James Pigg there, at the house, at half past six o'clock. Pigg was shot there that night. *        *        *        John Davenport, Oscar Martin, myself, Lee Brown, Alfred McClure and little Jas. Pigg were in the room.        *        *        *        The shot came from outside the window; we were all scared bad; after the shot was fired, he drawed around sideways, got up and fell. I started up-stairs ; Davenport picked Pigg up and put him on a pallet. Pigg then wanted me· to go for a doctor; Oscar Martin went to the door, shot off a gun, and went out and closed the shutters.        *        *        *
I wasn't up to the head of the stairs when Pigg fell. I think I turned round a time or two before I started to the stairs." (Here the question was asked and answered as above stated. Exception by defendant.)

The witness further testified: "Pigg asked me to come after the doctor; he was able to talk so I could understand him. Pigg was shot on Thursday, about half past

six. It couldn't have been more than a quarter of an hour after, when I started to town.     *     *     *     * Brown, Martin, I, and I think McClure and Mrs. Davenport, went up-stairs; nobody left down-stairs; I didn't say it was Wales shooting at me. Pigg wrote on a piece of paper. Randolph's name was not called. Little Jim Pigg did not say it was Randolph. Little Jim did not say it was Prince shot father. I used one name; immediately before I said Wales had shot at me, Pigg had said Prince shot him. I said it might be John Wales shooting at me. I said this five or six minutes after Pigg was shot. Pigg said Jones shot him, just before this. Little Jim Pigg said 'I believe Jones shot my father.' Jim Pigg wrote on a piece of paper after I was gone. Davenport was in the room all the time till I left. I think Jim Pigg was the first to say that Jones shot him. I said John Wales might have shot at me, because he had shot at me. We were all talking together. Other parties heard the same things.I did, when he named the person that shot him.     *     *     *     At the time Pigg said 'Go after the doctor,' I heard nothing else.     *     *     *     When little Jim Pigg said 'Prince Jones shot my father,' Jim Pigg said 'Ya, ya, ya.' Pigg talked to me till he said I could understand what he said.     *     *     .*     Pigg was on the floor when he used the expression I mentioned. John Davenport was the first one to him, and I was the next."

James Pigg, Jr., testified: " We were in the woods; about half past six o'clock in the evening somebody shot my father that night. He was sitting near the window: I was in the other corner; he was about three feet from the window; had his hands on his head. I didn't do any thing when the shot was fired." Here the State propounded to the witness the following question, to which

due objection was made, and exception taken to the ruling of the court in overruling the objection: "What were the first words your father, James Pigg, spoke after he was shot?" The witness answered: "He said Prince Jones shot him."

The witness further testified: "Father was by the window; was not talking to any one, just had got done smoking, and had laid his pipe on the floor. I waited a little and went up-stairs; came down, but did not speak to father; did not stay down-stairs long after father was shot. I got under the bed after a little time; don't know what father did. Howard ran up-stairs as soon as shot was fired. Davenport and McClure laid father down. Father was laid out on the floor before Howard came down-stairs. Father said the first thing after he was shot, 'Go for a doctor.' &ast; &ast; &ast; I did not say I believed Jones shot him. Howard was up at the head of the stairs, when father said it was Prince. &ast; &ast; &ast; &ast; Davenport, Martin, McClure and Brown were in the room when father said 'Go for a doctor.' I think it was Howard who asked father who shot him. This was about five or six minutes after he said 'Go for a doctor.' It was five or six minutes after he was shot before he said 'Go for a doctor.' Howard was not there when he said 'Go for a doctor.' It was five or six minutes after father said 'Go for a doctor,' that he said Prince Jones shot him. The first thing I heard father say after he was shot was, 'Go for a doctor.' &ast; &ast; &ast; Father wrote a paper that night; wrote it because he couldn't talk. That's the way I knew he said Prince Jones shot him; read it on the paper; never heard him say so. Wasn't in the room when he said Prince shot him; heard others say he said it. It was about ten minutes after father was shot that I went up-stairs. He didn't say in that time who shot him. When I came down-stairs

he wrote on a paper who shot him.  This was the first I knew who shot him.  He did not try to talk any while I was there; couldn't make himself understood by talking. *    *    *    *    The first words father said after he was shot was, ' Go for a doctor.'  I was up-stairs ten minutes.  It was about five or six minutes after father was shot before I went up-stairs."

The statement of the deceased, thus testified to by James Howard, seems to have been orally made, though the witness spoke of Pigg having written on a piece of paper. It is clear that he meant to speak of an oral statement, as he said that other parties heard the same things he did, when the deceased named the person who shot him. The statement was not made until some minutes after the shooting was done, and while the parties in the house, in the language of the witness, " were all talking together."

The statement testified to by James Pigg, Jr., was not made orally, but in writing; and this paper could not have been written until some minutes after the shooting. It would seem from the evidence to have been written after the oral statement testified to by Howard.

There is no pretence, that, at the time these statements were made, Pigg was conscious of the mortality of the wound, or that they could have been received in evidence as his dying declarations.  The question arises, therefore, whether they were admissible as part of the res gestæ.

We are clear that the statements constituted no part of the res gestæ, and were not admissible as such.  They in no manner served to illustrate the main fact, the shooting.  The chief purpose of them was to show, not that the deceased had been shot, or the manner in which, or the circumstances under which, but the person by whom, it had been done.  In Binns v. The State, 57 Ind. 46,

this court said, quoting from Greenleaf: "The principal points of attention are, whether the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration, and whether they are so connected with it as to illustrate its character."

It can not, with any propriety, be said, that the statements made by the deceased, after the crime had been fully completed, that Prince Jones shot him, served in any degree to illustrate the character of the main fact, the shooting. They were the simple statements of the deceased, narrative of what had already transpired, and important only as indicating the person by whom the main fact had been perpetrated.

It may not be necessary that the declarations should be strictly contemporaneous with the main fact, in order to be admissible. See a paragraph from Taylor's Evidence, quoted in the case of *Binns* v. *The State, supra.*

But all the authorities agree, so far as we are advised, that a declaration which amounts to no more than a mere narrative of a past occurrence is not admissible. Thus Mr. Taylor says, in the paragraph above alluded to : " Still, an act can not be varied, qualified, or explained, either by a declaration which amounts to no more than a mere *narrative of a past occurrence*, or by an *isolated* conversation held, or an isolated act done, at a later period."

In Wharton Crim. Ev., section 264, it is said : " The rule before us, however, does not permit the introduction, under the guise of *res gestæ*, of a narrative of past events, made after the events are closed by either the party injured or by by-standers." Numerous authorities to the point are cited in a note.

The same author says, at section 691 : " The test is, were the declarations the facts talking through the party, or the party's talk about the facts ? "

We attach no special importance to the fact that the declarations were made, not contemporaneously with, but a few minutes after, the shooting, further than that it shows, in connection with the substance of the statements, that they were purely narrative of what had already transpired. The length of the interval of time between the main fact and the statements can not be important, if such time elapsed as to make the statements, having regard to their form and substance, mere narration.

The deceased is supposed to have said, a few minutes after the shooting, "Prince Jones shot me." This is as clearly mere narrative as if a greater length of time had elapsed ; as much so, indeed, as if one should say, "Cæsar crossed the Rubicon," or should make any other statement of a remotely past transaction.

We are of opinion that the court erred in admitting the statements thus made in evidence.

During the progress of the trial, Dr. E. O. Spencer was asked by the State the following question, viz.:

"State whether or not, in your opinion, a person seated at or near a window in a room where there was a bright fire light and a lamp situated above and back of such person, it being dark on the outside, could see and recognize a person at or near the window on the outside."

The defendant duly objected to the question, but the objection was overruled, and the witness answered.:

"I think you could see them ; I have made experiments and could see them."

William Loudon was asked by the State the following question :

"State what means you have of knowing whether or not a person seated at or near a window on the inside of a room, a bright light burning in the room, the person

at or near the window on the outside, it being dark outside, could see him."

Objection as before overruled.

"Ans. I tested the matter on two occasions. I could see very distinctly as soon as the object came within the rays of the light. I could see very distinctly."

There is a variety of cases put in the books, in which a witness, not an expert, may give an opinion. Wharton Crim. Ev., sections 457 to 462; Best on Ev., section 517; *Commonwealth* v. *Sturtivant*, 117 Mass. 122. But it seems to us that the experiments thus made by the witnesses, and the results thereof and opinions founded thereon, were utterly incompetent. They could be valuable or pertinent only so far as they might lead to the opinion or conclusion that the deceased might have seen and recognized Prince Jones, or the person who shot through the window. The sole purpose of them was to satisfy the jury that such was the fact.

The experiments were not made at the house where Pigg was shot, but elsewhere. It would probably be difficult, if not impossible, to make an experiment elsewhere, under just the circumstances that existed at the time Pigg was shot, including the extent and situation of the lights in the room, the extent of light or darkness outside, the quality of the window glass, etc.

The question, whether Pigg could have seen and recognized the person outside who shot, was not one of skill or science, but was one which it was the province of the jury to determine from the evidence as to the circumstances and condition of things at the house at the time of the shooting.

The experiments made elsewhere, and the results and the opinions founded on them, were entirely extraneous and foreign to the case, and not competent to prove, or as tending to prove, any fact involved in the issue.

The appellant has made some other points which we

deem it unnecessary to consider, as the questions may not arise upon another trial of the cause.

For the reasons above stated, the judgment below will have to be reversed.

The judgment is reversed, and the cause is remanded for a new trial.

NOTE. —The clerk will give the proper notice for the return of the prisoner.