# McKee v. State of Indiana.

[No. 24,872. Filed December 17, 1926.]

1. HOMICIDE.—*Killing, is presumed to be murder in absence of circumstances excusing, justifying, or mitigating, the act.*—An instruction in a prosecution for murder that if the killing of the person mentioned in the indictment has been proved beyond a reasonable doubt to have been the act of the defendant, the law presumes it to have been murder unless the evidence shows circumstances excusing, justifying or mitigating the act so as to make it manslaughter, was not erroneous. p. 593.

2. CRIMINAL LAW.—The presumption of innocence remains with the defendant throughout the trial, and it is the jury's duty,

if possible, to reconcile all the evidence on the theory that the defendant is innocent. p. 594.

3. CRIMINAL LAW.—*If instruction as to presumption of defendant's innocence was correct as far as it went, but faulty, defendant should have requested more complete instruction.*—Although an instruction in a murder case as to the presumption of defendant's innocence continuing throughout the trial was faulty but good as far as it went, if he desired a more complete instruction on the subject, it was his duty to prepare and tender one to the court and request that it be given. p. 594.

4. HOMICIDE.—*Testimony by defendant that he had heard that deceased had committed acts of violence on other persons, and threatened to kill others, properly excluded.*—In a prosecution for murder, proffered testimony by defendant that he had heard from an unnamed source that the deceased had committed certain acts of violence on other persons, and that he had made threats to kill others, was properly excluded, as it was hearsay. p. 597.

5. HOMICIDE.—*Testimony that deceased had chased a negro lad with an iron bar and assaulted him with it was admissible.*—In a prosecution for murder, evidence that a witness saw the deceased chase a negro lad with an iron bar and assault him with it was admissible on question of who was the probable aggressor and as confirming defendant's claim that he feared the deceased intended to kill him. p. 598.

6. HOMICIDE.—*Specific acts of violence by deceased on third parties of which defendant had knowledge may be proved after some evidence that accused was the aggressor.*—In a prosecution for murder, where the defense is that the killing was done in self-defense, the defendant may prove specific acts of violence committed by the deceased upon third parties, of which the defendant had knowledge prior to the homicide, for the purpose of showing the defendant's state of apprehension, after some evidence that accused was the aggressor. p. 598.

7. HOMICIDE.—*Right of self-defense can only be determined from standpoint of defendant at the time and under existing circumstances as shown by the evidence.*—When one charged with murder defends on the ground that the killing was done in self-defense, the existence of danger to the defendant, the necessity of defending himself, and the amount of force necessary to employ, can only be determined from the standpoint of the defendant at the time and under existing circumstances, as shown by the evidence. p. 600.

8. HOMICIDE.—*"Dying declarations" defined.*—"Dying declarations" are statements of material facts concerning the causes and circumstances of the homicide made by the victim under

a fixed and solemn belief that death is inevitable and near at hand.    p. 602.

9.  HOMICIDE.—*When unsworn statements can be admitted as "dying declarations."*—Unsworn statements can be admitted in evidence as dying declarations only when made while *in extremis* and after the declarant had abandoned all hope of recovery from the injury inflicted by the accused and was under the firm conviction that death was inevitable and near at hand. p. 602.

10.  HOMICIDE.—*Competency of "dying declarations" is question for the trial court.*—The competency of "dying declarations" is a question for the trial court, to be determined by the proof of declarant's state of mind at the time he made the declarations.    p. 604.

11.  HOMICIDE.—*Declarant's state of mind when making dying declarations, how determined.*—In determining whether deceased's unsworn statements are admissible as "dying declarations," the court is not limited to the declarant's statements as to his condition, his sense of impending death, and his abandonment of hope of recovery, but these facts may be inferred from the conduct, manner, symptoms and condition of the declarant, including the extent and character of his wound or the nature and state of his illness.    p. 604.

12.  HOMICIDE.—*"Dying declarations" should be closely scrutinized and not admitted in evidence unless all prerequisites are clearly established.*—"Dying declarations" should be closely scrutinized and great care and caution exercised in determining whether they are admissible, and they should not be admitted in evidence unless all the prerequisites which are essential to their admissibility are clearly established.    p. 605.

13.  HOMICIDE.—*Proof that "dying declarations" were made under sense of impending death necessary to their introduction in evidence.*—As a prerequisite to the introduction in evidence of "dying declarations" in a murder trial, proof must be made that the declarant, at the time of making them, believed that his injuries were mortal and must speedily prove fatal. p. 605.

14.  HOMICIDE.—*Evidence held insufficient to qualify admission as "dying declarations."*—Evidence *held* insufficient to justify the admission of unsworn statements as "dying declarations," as it did not show that declarant realized the imminent approach of death.    p. 607.

From Bartholomew Circuit Court; *John W. Donaker,* Judge.

Melvin McKee was convicted of murder in the second degree, and he appeals. *Reversed.*

*C. J. Kollmeyer,* for appellant.

*Arthur L. Gilliom,* Attorney-General and *Edward J. Lennon, Jr.,* Deputy Attorney-General, for the State.

WILLOUGHBY, J.—The appellant was convicted of murder in the second degree. The indictment was found by the grand jury of Bartholomew county in the State of Indiana, and charged that the crime was committed on May 21, 1924. A trial by jury resulted in the conviction of appellant of murder in the second degree. Judgment was rendered upon the verdict and from such judgment this appeal is taken. The appellant has assigned as error that the court erred in overruling his motion for a new trial. The errors specified in said motion for a new trial are, that the court erred in the giving, of its own motion, of certain instructions to the jury, over the objection and exception of the defendant and that the court erred in the admission and rejection of certain evidence. The appellant in his brief alleges that the court erred in giving instructions Nos. 25 and 30.

The appellant claims that instruction No. 25, given by the court of its own motion, is erroneous. Said instruction is as follows: "If the killing of the person mentioned in the indictment has been satisfactorily shown by the evidence, beyond all reasonable doubt, to have been the act of the defendant, then the law presumes it to have been murder, provided the jury further believes from the evidence, beyond a reasonable doubt, that no circumstances existed excusing or justifying the act, or mitigating it so as to make it manslaughter." He says that this instruction is not applicable to the evidence because the

presumption of law referred to in it can only arise in a case where the circumstances attending the homicide are disputed. In the instant case, the fact of the killing is not in dispute, and the instruction informs the jury that the law presumes it to have been murder provided that the jury further believes from the evidence, beyond a reasonable doubt, that no circumstances existed excusing or justifying the act, or mitigating it so as to make it manslaughter. The circumstances surrounding or attending the homicide are disputed, and, as in other cases of conflicting evidence, it is a question for the jury to determine what the circumstances are surrounding the homicide and, in that view of the case, this instruction is applicable to the evidence. We see no error in giving this instruction.

The appellant alleges that instruction No. 30, given by the court of its own motion, is erroneous. The part of this instruction set out in appellant's brief, 2, 3. and which he claims is erroneous is as follows: "The defendant is presumed to be innocent until he is proven guilty and this presumption continues with the defendant throughout the trial until overcome by the evidence. The defendant is not required to prove his innocence or that some other person committed the crime with which he is charged, but he may rest upon the presumption in his favor until it is overthrown by positive affirmative proof." He says that this instruction is erroneous because it does not state that the presumption of innocence continues throughout the trial through all its stages and terminates only when the verdict is reached. It is true that the presumption of innocence remains with the defendant step by step throughout the trial and it is the duty of the jury, if it can be done, to reconcile all the evidence on the theory that the defendant is innocent. This instruction complained of by the appellant is faulty for the reason he

asserts, that the presumption of innocence continues throughout the trial, through all its stages and terminates only when the verdict is reached, but the instruction is good as far as it goes. And if the appellant wanted a fuller and more complete instruction upon the subject, then it was his duty to prepare and tender one to the court at the proper time with the request that it be given. It does not appear that the defendant tendered any instruction to the court on this subject. The appellant having so failed to tender an instruction fully covering the subject, he cannot be heard now to complain. See *Bartlow* v. *State* (1915), 183 Ind. 398, 109 N. E. 201; *Ridge* v. *State* (1923), 192 Ind. 639, 137 N. E. 758; *Bowers* v. *State* (1925), 196 Ind. 4, 146 N. E. 818; *Jeffries* v. *State* (1925), 195 Ind. 649, 146 N. E. 753; *Cazak* v. *State* (1925), 196 Ind. 63, 147 N. E. 138; *Haverstick* v. *State* (1925), 196 Ind. 145, 147 N. E. 625; *Sims* v. *State* (1925), 197 Ind. 311, 147 N. E. 520.

It appears from the evidence that James Henry owned a farm near Columbus, Indiana, and that he employed on the farm Willard Mingous, and his brother, Frank Mingous, and also the appellant Melvin McKee. McKee had been employed to do carpenter work about the farm and the other two were employed to do general farm work. On May 21, 1924, they were all three at work on the James Henry farm. Henry, the owner of the farm, left on that day about 2 o'clock with Frank Mingous, leaving Willard Mingous and Melvin McKee at work on the farm, tearing down and removing a chicken house. Frank Mingous and the owner of the farm returned about 4 o'clock. The chicken house was about half way between the dwelling house and the barn. When Frank Mingous and James Henry returned about 4 o'clock, Melvin McKee, the appellant, was out at the chicken house. When asked where Mingous was, the appellant replied, "I shot him." When asked why he

did it, he said,- "I had to." The owner of the farm went to the house and McKee followed. Willard Mingous, the deceased, was lying on the bed. Mr. Henry said he questioned Mingous as to where he was shot and he said, in the side, when he was about fifteen feet away. Frank Mingous went for a doctor. A doctor came and gave the deceased a hypodermic and said he would have to be taken to the hospital. The owner of the farm took him to the hospital. He said that McKee, the appellant, said that Willard Mingous was coming at him with the butcher knife and he had to shoot him. Some of the bed clothes in the bedroom were disarranged. The guns were on the west side of the sideboard and they belonged to Frank Mingous and the deceased. Mr. Henry said he picked up a knife in the kitchen before the sheriff and the doctor came and brought it in the room where Willard was and laid it on the table.

Frank Mingous, the brother of the dead man, testified that he and Mr. Henry went to Bald Knob after some hogs. There had been no quarrels or sharp words between Willard and McKee that morning that he knew of. That when they left, McKee was by the wagon at the chicken house and Willard was in the barn. That when they came back, McKee was in the yard standing by the chicken coop. That he blowed the horn for Willard but he didn't come. He then went into the house to look for Willard.

At the trial, the appellant testified as a witness, and after some explanation of how the quarrel commenced, the appellant testified concerning the encounter with the deceased as follows: "Then he grabbed up a wrecking bar seven-eighths inch iron, and hit me with the wrecking bar in the chest. When I started to run away, he threw something. I think it was a piece of board and hit me on the leg. I went up to the house and went

into the kitchen.  He came after me, he was cussing. I hollered to him not to come in with a knife.  I was scared of him and I knew that if he got to me he would kill me.  He came on in to the dining room and then I shot him.  He threw the knife down and turned around and went away.  I expect I was about twenty feet away when I shot him.  I then went straight out to the barn.  He put the team in the driveway then he came around and sunk down in the side of the manger and said 'Get a doctor.' "

After some evidence had been heard in regard to the age, size, strength and disposition of the deceased, the defendant offered to testify that, prior to the alleged homicide, he had heard from an unnamed source that the deceased had committed certain acts of violence on a number of other persons and had made threats to kill his wife and his mother-in-law and others.  But he did not know of his own knowledge that anything he offered to testify he had heard was true, and he did not offer to introduce evidence that what he had heard or any part of it had, in fact, occurred.  Objections for the reason, among others, that the questions in answer to which this evidence was sought to be introduced called for mere hearsay testimony were sustained.  These offers to testify were timely made and proper exceptions reserved.  In this case, the defense is that the killing was done in self-defense.  The writer of this opinion believes that where there is some evidence of self-defense, the defendant in homicide may testify as to specific acts of violence committed by the deceased upon third parties, knowledge of which was communicated to him prior to the homicide, without first proving that such acts of violence occurred, and it was error to reject this testimony of the defendant, but the majority of the court hold that such testimony should be rejected as hearsay evidence.  We therefore

hold that the court did not commit error in excluding the evidence.

The defendant also offered to prove by Samuel R. Perry, a witness for the defendant, if permitted to testify, that he, the witness, saw the deceased Willard Mingous, chase a negro lad with an iron club and assault him with it. This evidence was rejected by the court, on objection by the state that it was hearsay evidence. This was error. This evidence goes to the question of who was the probable aggressor and the apprehension of the defendant and corroborating such apprehension by showing existing reasons therefor.

In this case the defense is that the killing was done in self-defense. The defendant in homicide, where there is some evidence of self-defense, may prove specific acts of violence committed by the deceased upon third parties, knowledge of which has been communicated to the defendant prior to the homicide, for the purpose of showing the defendant's state of apprehension, and he ought to be allowed to prove every fact and circumstance known to him and connected with the deceased which was fairly calculated to create an apprehension of his own safety. 1 Wigmore, Evidence (2d ed.) §248; *Dukes* v. *State* (1858), 11 Ind. 557, 71 Am. Dec. 370; *Fahnestock* v. *State* (1864), 23 Ind. 231; *Holler* v. *State* (1871), 37 Ind. 57, 10 Am. Rep. 74; *Wood* v. *State* (1883), 92 Ind. 269; *Boyle* v. *State* (1884), 97 Ind. 322; *Leverich* v. *State* (1886), 105 Ind. 277, 4 N. E. 852; *Bowlus* v. *State* (1892), 130 Ind. 227, 28 N. E. 1115; *Enlow* v. *State* (1900), 154 Ind. 664, 57 N. E. 539; *Osburn* v. *State* (1905), 164 Ind. 262, 73 N. E. 601; *Knapp* v. *State* (1907), 168 Ind. 153, 79 N. E. 1076; *Horbach* v. *State* (1875), 43 Texas 242; *Sneed* v. *Territory* (1906), 16

Okla. 641, 86 Pac. 70, 8 Ann. Cas. 354; *People* v. *Harris* (1893), 95 Mich. 87, 54 N. W. 684.

In *Boyle* v. *State, supra,* which was a trial for murder, and the defense was that the homicide was committed in self-defense, the defendant testified as a witness, that, when he shot the deceased, the latter was striking at him with a knife, and that their acquaintance was a brief association as criminals. An offer to testify that the deceased had, but the night before, told the defendant of two felonious assaults which he had committed, and that he preferred a knife to a pistol as more effective for such work, was refused by the court. This was held to be error. And the court, in discussing the case, said: "As, in personal conflicts, every man is permitted, within reasonable limits, to act upon appearances and to determine for himself when he is in real danger, it would seem to follow, as an inevitable consequence, that whoever relies upon appearances, and a reasonable determination upon such appearances, as a defense in a case of homicide, ought to be allowed to prove every fact and circumstance known to him and connected with the deceased, which was fairly calculated to create an apprehension for his own safety. Any narrower rule than this would, we think, prove inadequate to full justice in all cases of homicide, and would, in many cases, operate as a serious abridgement of the law of self-defense."

In *Duncan* v. *State* (1882), 84 Ind. 204, the court said: " 'It is enough, to make out a case of self-defense, if the defendant, being without fault, believes, and had reasonable ground to believe, from the acts of the deceased, that his life is in danger, or that he is in danger of great bodily harm.' Such plainly is the reasonable rule, and it necessarily follows that the court erred in refusing to permit the defendant to testify in reference to his belief. His belief was, in respect to the claim

that he acted in self-defense, a material fact to be shown by any competent evidence. The defendant was a competent witness, and alone of all witnesses had personal knowledge of the fact, and had a right to declare it. What credit, if any, his testimony should have received must have been determined by the jury."

The right of self-defense is allowed to the citizen as a shield and not as a sword, and, in the exercise of this right, a person must act honestly. A person assaulted may exercise a reasonable degree of force to repel an attack, but must not provoke an attack in order that he may have an apparent excuse for killing his adversary. The question of the existence of danger to the defendant, the necessity of defending himself, as well as the amount of force necessary to employ, can only be determined from the standpoint of the defendant at the time, and under the existing circumstances as shown by the evidence. In the instant case, the defendant admits he shot the deceased, but claims he did it in self-defense, and it being the law that the amount of force necessary to be employed in defending himself must be determined from the standpoint of the defendant at the time and under the existing circumstances as shown by the evidence, it must be true that the defendant has a right to show the character of the deceased and has a right to offer in evidence whatever he may know in regard to the disposition of the deceased, as to being quarrelsome, and has a right to give in evidence specific acts of the deceased in that regard, which had come to his knowledge prior to the homicide, so that the jury may know what apprehension he was under at the time of the killing. It would be impossible for the jury to determine from the standpoint of the defendant what amount of force was necessary to repel an attack and what apprehension he was under at the time of the killing, unless the evidence

presents to the jury the circumstances under which the attack was made.

A surgeon who attended the deceased after he had been shot, and before a surgical operation, testified that Mingous had stated that McKee shot him, after McKee had attacked or threatened to attack Mingous with a knife; that Mingous took the knife away from him and directly afterwards McKee shot him. This was admitted by the court as a dying declaration over the objection and exception of appellant. The surgeon had previously testified that while he thought the patient was in imminent danger of death, he did not know whether Mingous realized whether he was in danger of death and that he made no expression that he thought death would take place. On cross examination, the surgeon testified that he determined that an operation was necessary. He determined that the declarant was having internal hemmorhages, which might possibly be controlled. He said further that if upon the operation he found that auxiliary or subsidiary blood vessels had been punctured, they could have been tied up, and that it was the hope of the physicians that only a minor blood vessel had been punctured and that it might be controlled and his life saved. He said there was some slight hope. The admission of the evidence as a dying declaration was objected to by the defendant on the following grounds: (1) That such statement would be purely hearsay; (2) that, as a dying declaration, it is incompetent, for the reason: (a) that the certainty of death has not been sufficiently shown or proved; (b) that the declarant himself is not shown to have realized the inevitable approach of death; (c) that the evidence does not show that the declarant realized that death was surely and almost immediately to take place.

Dying declarations are statements of material facts concerning the causes and circumstances of homicide

made by the victim under a fixed and solemn be-

8. lief that death is inevitable and near at hand. 21 Cyc 973.

Unsworn statements can be admitted in evidence as dying statements only when made *in extremis,* and it is not enough that the statement was made when

9. the declarant was *in extremis,* it is also essential that it be made when he has abandoned all hope of recovery from the injury inflicted by the accused and is under the firm conviction that death is inevitable and near at hand. 21 Cyc 976, 977; *Watson* v. *State* (1878), 63 Ind. 548; *Morgan* v. *State* (1869), 31 Ind. 193; *Jones* v. *State* (1880), 71 Ind. 66.

There is no evidence in the record showing an affirmative statement by the declarant that he thought he was in imminent danger of death, but the appellee claims that while this is true, the fact that he thought he was in imminent danger of death may be inferred from the surrounding circumstances and cites us to *People* v. *Falletto* (1911), 202 N. Y. 494, 96 N. E. 355. *People* v. *Falletto, supra,* can be readily distinguished from the case at bar. In that case, the court said, in discussing the preliminary proof: "But one question of law requires discussion and that is whether the dying declarations of the deceased were properly received in evidence subject to the objection of the defendant. The preliminary evidence tended to show that the deceased could not speak until 'his throat was sewn' at the hospital, about thirty minutes after the wound was inflicted and after the operation he could speak only in a whisper. Just before the operation, the surgeon told him that he was liable to die as the result of the injury, but he does not appear to have made any reply. In the evening, the surgeon asked him how he felt and he said: 'I don't know what I have done in this world to deserve such an end.' Some minutes later, when he showed

signs of choking as the blood ran down his windpipe into his lungs, the doctor again asked him how he felt, and he replied, 'I feel better, if I could only cough this up I might feel better.'

"On Saturday evening, about thirty hours after the injury, the surgeon asked him 'if he wished to say his religious rites, if he wished to say vivi, that is the last rite of the Hebrew church,' of which he was a member. 'I asked him if he wanted to say vivi and I would sent for Mr. Stein, the rabbi.' It does not appear that the deceased assented to this or requested that the rabbi should be sent for, but he came, and at once asked Mr. Levine, 'Do you want to say vivi?' The answer was, 'Yes,' and thereupon 'they proceeded to say vivi. They went through the last rites of the Hebrew church. * * * The last rites for the dying.' Right after this the surgeon asked him if he had anything else to say in the presence of his family who had assembled by his bedside, and he said, 'Yes, I want my family to pay the following debts,' giving the names of his creditors. The surgeon further testified: 'After we had stitched up the wound he was able to make himself understood by speaking in a low whisper, because his windpipe was connected, but the blood was just the same, gradually going into his lungs and choking him by degrees, and from the lapse of blood he was actually getting weaker, and he was rapidly failing, sinking. On this Saturday night, when the rabbi was there, he had been in a comatose condition before that time. * * * He was sinking very rapily, growing worse all the time, growing worse all this while from loss of blood, and the blood going into his lungs, and his heart was growing weaker. * * * There was no hope at all of his recovery.

"A daughter of the deceased testified that on Saturday evening about eight o'clock a good many persons

from the synagogue, as well as several members of her own family, had gathered about his bed. She 'was present when Rabbi Stein said the last rites, called vivi. * * * The last rites, they say that when they know they are going to die, they ask for it.' As soon as the vivi was said, the deceased told his family to pay all his debts, and the rabbi 'put all the names down that he said he owed, and every one was correct.' After the last service for the dying had been performed, and the deceased had given directions for the payment of his debts, he told his friends about his bedside how he was injured."

In *Williams* v. *State* (1925), 196 Ind. 84, 149 N. E. 441, the court said that the competency of a dying declaration is a question for the trial court to be determined by the proof relative to declarant's state of mind at the time he made the declarations. The proof preceding the admission of such declarations must convince the trial judge that they were uttered under a sense of impending death without hope of recovery, or that the declarant fully believed that death was so near that all motives to falsehood were superseded by the strongest motive to strict veracity. *Williams* v. *State* (1907), 168 Ind. 87; *Gipe* v. *State* (1905), 165 Ind. 433, 1 L. R. A. (N. S.) 419, 112 Am. St. 238; *Watson* v. *State, supra; Morgan* v. *State, supra; Jones* v. *State, supra.*

Proof of the fact thus to be settled by the judge is not limited to the declarant's statement alone, but .it may be inferred from the general statements, conduct, manner, symptoms and condition of the declarant, which flow as the reasonable and natural results from the extent and character of his wound, or the state of his illness.

The evidence in the instant case fails to show that the declarant himself realized the inevitable approach of

McKee *v.* State—198 Ind. 590.

death, and does not show that he said so and does not show any facts from which it could be inferred that he so believed. It is true one of the doctors testified that Mingous realized that he had but very few chances to get well and death might come at any time. The other physician said that he did not know whether a major blood vessel had been punctured or whether a minor one had been punctured, and that it was only after he had cut into the abdomen and found blood coming from a major blood vessel that he gave up hope. He said that it was the hope of the physicians that some minor subsidiary blood vessel had been punctured and that these might have been ligated or bound up. It thus appears from the testimony of both physicians testifying in this case upon that subject that neither one of them knew whether the wound was fatal or not until after the operation had been performed. The statement introduced as the dying declaration of the declarant was made before the operation had been performed at the hospital.

In view of their inherent infirmities as evidence, dying declarations should be closely scrutinized, and great care and caution exercised in determining 12. them to be admissible. They should not be considered by the jury unless the prerequisites which are essential to their admissibility are clearly established. 30 C. J., Homicide, p. 261, §503.

When admitted, dying declarations are weighed and considered in the same manner as other evidence. It is always necessary to lay a foundation for the 13. introduction of dying declarations on the trial of an indictment for murder by first proving that they were made under a sense of impending death. This may be proved by the express words of the deceased to such effect if he made it a part of his declaration; but if he made no direct statement on the

subject, it will suffice to prove his conduct and condition and to show facts and circumstances which reasonably satisfy the court that he was *in extremis* and that he was, at the time of making his statement, conscious of his approaching dissolution. While it should always be borne in mind that the vital fact is that the declarant himself believed that he was about to die, there are certain circumstances which often tend to show the declarant's sense of impending dissolution, as, for example, that a priest had been summoned, who, before the making of the statement, had administered to the declarant the last rites of the church, or the previously disclosed opinion of his physician or other attendants that his injuries were mortal and must speedily prove fatal. Again, the serious character of the injury and the evident danger of the declarant's condition may always be shown as circumstances tending to deprive him of hope. So, also, the court may consider whether the conduct of the deceased was that of a person conscious of impending death, as whether he gave directions respecting his funeral, his will, the care and custody of his children, or took leave of his relatives and friends, and the like. 21 Cyc, Homicide, p. 982. See, also, *Donnelly* v. *State* (1857), 2 Dutcher (26 N. J. Law) 463, 499; *People* v. *Falletto, supra.*

In *Williams* v. *State*, 168 Ind. 87, 91, the court said: "If the court is convinced, from the testimony of the witnesses, that the deceased, when he muttered the proffered declaration, was in expectancy of impending dissolution, he should permit the declaration to go to the jury, to be by them considered as other evidence under proper instructions of the court. An appellate tribunal is not in a situation to weigh the preliminary evidence as intelligently as the trial judge who had the witnesses before him, and will, therefore, not reverse the action of the

lower court in admitting such evidence unless the error is manifest."

If the facts proved in laying the foundation for the introduction of dying declarations fail to bring such declarations within the legal definition of dying declarations, then such declarations should not be admitted.

In *Donnelly* v. *State, supra,* the court says: "It is suggested, as a preliminary objection, by the counsel of the state, that whether the person making the declarations was or was not under a sense of impending death, was a mere question of fact, to be decided by the judge; and that, being a mere question of fact, it is not the subject-matter of a writ of error, and cannot be drawn in question in this court. The answer to the objection is, that the decision involves a mingled question of law and of fact. What constitutes a dying declaration is a question of law. Whether, therefore, the circumstances shown upon the trial evince that the statement offered is what the law denominates a dying declaration, is a question of law, and the proper subject of review upon a writ of error. In dealing with this question the court here will give to each fact sworn to, its appropriate effect, without questioning the credibility of testimony or the truth of the facts put in evidence. Upon the mere credibility of the testimony, upon this preliminary issue, the decision of the court below must be regarded as final."

Without questioning the credibility of the evidence introduced as preliminary proof in the case at bar, it is clear that such preliminary evidence was not sufficient to place the statements admitted as dying declarations of the deceased within the legal definition of dying declarations. They were not sufficiently shown to be dying declarations within the meaning of the law and should not have been admitted as such.

Judgment reversed, with instructions to sustain appellant's motion for a new trial.

It is further ordered that the Clerk of this Court make out and certify to the Warden of the State Prison of the State of Indiana an order for the return of the appellant to the custody of the sheriff of Bartholomew county, Indiana.