## ENLOW *v.* THE STATE.

[No. 19,219. Filed May 29, 1900.]

CRIMINAL LAW.—*Assault With Felonious Intent.—Evidence.*—Evidence of an assault and battery is admissible in a prosecution for an assault with intent to commit murder under §1982 Burns 1894. *p. 668.*

SAME.—*Assault.—Threats.—Evidence.—Self-Defense.* — Where in a prosecution for an assault with intent to commit murder the defense was made that defendant believed when he fired the shots that the prosecuting witness was advancing toward him with a gun in his hand, and that he shot in self-defense, the court erred in excluding evidence of a prior altercation between the parties and a threat by the prosecuting witness to kill the defendant. *pp. 669, 670.*

SAME.—*Self-Defense.—Instructions.*—Where in a prosecution for an assault with intent to commit murder there was evidence that defendant believed when he fired the shots that the prosecuting

witness was advancing toward him with a gun in his hand, and that he afterward saw it was an umbrella, and stopped shooting, the court erred in refusing to instruct the jury that if the accused honestly believed, and had the right to believe, that he was being violently assaulted with a dangerous and deadly weapon, and that he was in danger of receiving great bodily harm at the hands of his assailant, then his right of self-defense intervened, notwithstanding the fact that it afterward developed that the apprehended danger was not real.   *pp. 669, 670.*

From the Crawford Circuit Court.   *Reversed.*

*J. W. Weathers* and *M. W. Funk*, for appellant.

*J. L. Suddarth, C. L. Fleshman, W. E. Cox, W. L. Taylor*, Attorney-General, *Merrill Moores* and *C. C. Hadley*, for State.

BAKER, C. J.—Appellant was convicted of assault with intent to murder one James Summers.   The error assigned and presented is the overruling of the motion for a new trial.

Appellant lived with his mother a mile and a half north of Taswell in Crawford county.   Summers lived three-fourths of a mile south of Taswell.   A railroad runs east and west through the village along one of its streets.   In the afternoon of March 18, 1899, appellant and Summers passed each other in the village, but nothing occurred between them.   Appellant started along the railroad west towards a highway leading north to his home.   Summers could go home, either by turning off to the south before reaching the north and south highway on which appellant lived, or by turning south at that same highway.   Summers was ahead of appellant in starting home and was walking along the part of the street on the south side of the railroad. Summers stopped and talked with some one and appellant passed along the track and entered a somewhat deep cut through which the railroad runs.   The street Summers was on passes over the hill through which the cut is made and then comes to the level of the railroad at the west end of the village, where the highway runs north to appellant's home.   After Summers passed over the hill, he says that he

saw appellant sitting on the railroad at the highway crossing; that, when he was within thirty-five or forty steps from appellant, the latter arose and began shooting at him; that appellant fired seven shots; that one bullet cut his coat; that he had a small black umbrella, rolled up and fastened, under his arm or in his hand; that the umbrella may have been protruding before him; that he can not say how late it was; that it was not yet dark; that he had never heard of any threats by appellant against him; that he had had trouble with appellant on December 24, 1898. The theory of the State is that appellant lay in wait for Summers and maliciously attempted to murder him. The theory of the defense is disclosed by appellant's testimony: "That was the last day of the Taswell school. I was at the school until it closed, which was about 4 o'clock in the evening. Then I went up in town. Afterwards I was at the store and around town. I saw James Summers over at the depot platform first, after the school was out. I met him once on the street or rather passed him. We did not speak. We had never spoken since December 24, 1898. I had not seen him but once since that time and I spoke to him then and he refused to speak to me. We were not friendly. I knew he was mad. I had heard that he intended to kill me if he ever got an opportunity. This was the second time I had seen him since. I came to Taswell. I carried a pistol because I was afraid of him, Summers. I had heard that he was threatening me. I bought a pistol that evening in Taswell. There was a young man by the name of Noble Denbo going to the regular army and wanted to sell his pistol and I bought it and put it in my pocket to take home. I started home. It was late in the evening when I started home. I went down the railroad as the dirt road which runs just north of the railroad was muddy. It was a muddy time. Had been raining that day. Summers was ahead of me but was on the road south of the railroad. He stopped and was talking to some men just after I started. I passed on intending to go home. I met Charley Henry on

the railroad and we talked there together some time. I never mentioned Summers' name to Henry. I met a boy by the name of Belcher and talked to him. After I left Summers talking to those men, I did not see him any more until just before the shooting, as I could not see him before I went through a cut on the railroad. I thought he had gone home. I knew that there was a way before he got to Phil Suthard's house. I went down the railroad to where I could turn off to go home. When I got in about ten or fifteen feet from where the public road crossed the railroad where I always turn north to go home, my foot slipped off a tie and I broke my shoestring. The string was old and I stooped down and took out the old string and put in a new one. When I started to go on I broke the string in the other shoe and I stooped down to put a new one in that shoe. I had bought a nickel's worth of new strings that evening. It was dusk or getting dusk when I broke my shoestring. While I was stooping down fixing my shoestrings, I heard a noise as of some one kicking on a rock on the slant of the cut east of me. I looked up and saw James Summers coming down the slant with something in his hand which I thought was a gun. I thought he had gone into Phil Suthard's and got a gun. He had it stuck out in front of him in this way. He was only thirty feet away and was coming down the slant towards me and I, believing I was in danger of my life, pulled my pistol and began to shoot at him. I fired four shots from that pistol and the fifth shot would not go and then I pulled the other pistol I had bought and fired one shot out of it. He came on towards me until I shot the last shot. And just as I fired that shot he turned around. When he turned I saw the handle of the umbrella and saw it was an umbrella. I then stopped firing. I thought he had a gun, until he turned and I saw by the crooked handle that it was an umbrella. The second revolver I fired from was a five shooter and was loaded full. I never went towards Summers. Then I went on home. After I got over by the schoolhouse about a hundred yards away I fired

my pistol up in the air. I fired at Summers in defense of my person. What I did was to defend myself. I thought he had a gun and I heard that he was going to kill me. I knew that he had tried to do it on December 24, 1898. Yes I have been treated for mental trouble by Dr. Gobbel of English, Dr. Sanders of Taswell, and Dr. Boyd of Paoli."

Appellant objected to the testimony of Summers that one of the bullets cut his coat. The contention is that it was erroneous to admit evidence of an assault and battery under a charge of assault. Appellant was prosecuted under §1909 R. S. 1881, §1982 Burns 1894, which reads: "Whoever perpetrates an assault or an assault and battery upon any human being, with intent to commit a felony, shall, upon conviction thereof, be imprisoned," etc. If this section be regarded as defining one crime, the objection is untenable. If the section defines two crimes, the objection is equally baseless; for the two offenses are of the same class and the penalty is identical. On the one transaction, the State has the right to elect on which offense to count, and the defendant can not complain, if the proof covers the charge, and incidentally discloses as a part of the *res gestae* the other offense also. *Bonsall* v. *State,* 35 Ind. 460; *Hamilton* v. *State,* 36 Ind. 280, 10 Am. Rep. 22; *Polson* v. *State,* 137 Ind. 519.

Appellant did not interpose a written plea of insanity. The court permitted him to prove his physical and mental condition from the first of September, 1898, to the time of the alleged assault,—that he was weak and nervous and subject to delusions that some one was about to kill him. Appellant complains of the court's refusal to allow him to prove his condition in July, 1898. "Independently of any question of insanity, the defendant in a criminal cause has the right to have his general physical as well as his mental condition at the time of the commission of the supposed crime explained to the jury, so as to put them in possession of all the facts connected with the transaction, and the better to enable them to judge of its character; but when insanity is relied

upon as a shield against punishment, it must be specially pleaded." *Sage* v. *State*, 91 Ind. 141. The offered evidence was competent, and it was excluded only on the ground that it was too remote from the time of the alleged assault. In view of the full inquiry that extended back over a period of six months, and of the fact that a limit must be set at some point, it is not clear that the court abused its discretion in refusing to go back eight months.

The court refused to permit appellant to prove that at a dance in the evening of December 24, 1898, Summers had held appellant while one Brackens stabbed him in the side with a knife, and that in January and February, 1899, Summers had made threats to take appellant's life. In excluding this testimony, the court said to appellant's counsel in the presence and hearing of the jury: "The fact that it was an umbrella and not a gun is the trouble with your case." The court also refused to give the following instruction: "In this case, if you believe from the evidence that, at the time of the alleged assault, James Summers, the person upon whom it is alleged that the assault was committed, was advancing toward the accused with a closed umbrella in his hand, in such a manner and under such circumstances that the accused honestly believed and reasonably had a right to believe that he was being violently assaulted with a dangerous and deadly weapon and that he was in danger of receiving great bodily harm at the hands of his assailant, then his right of self-defense intervened, notwithstanding the fact that it afterwards developed that the apprehended danger was not real." The evidence of the prior altercation and threats was competent; the remarks of the court were improper; and the requested instruction should have been given. Whether or not appellant was honest in his claim that, in the dusk of the evening, he believed from appearances that Summers was advancing upon him with a gun, was a question that, under appellant's testimony, should have been properly submitted to the jury; and appellant had the right to corroborate his

statement that he was in fear of Summers, by proof of existing reasons therefor. *Dukes* v. *State*, 11 Ind. 557, 71 Am. Dec. 370; *Holler* v. *State*, 37 Ind. 57, 10 Am. Rep. 74; *Boyle* v. *State*, 97 Ind. 322; *Bowlus* v. *State*, 130 Ind. 227. The State refers to the case of *Martin* v. *State*, 5 Ind. App. 453; but the facts are not analogous.

Judgment reversed, with directions to sustain the motion for a new trial.