Hon. JNO. H. BURFORD, Chief Justice.
Hon. BAYARD T. HAINER, ⎫
Hon. BENJ. F. BURWELL, ⎪
Hon. CLINTON F. IRWIN, ⎬ Associate Justices.
Hon. FRANK E. GILLETTE, ⎪
Hon. J. L. PANCOAST, ⎪
Hon. M. C. GARBER, ⎭

C. E. McHugh v. Territory of Oklahoma.

(Filed June 11, 1906.)

1. INDICTMENT—Allegations—Phraseology. An indictment is sufficient which states the facts clearly and distinctly, in ordinary and concise language, without repetition, and which, construed under the ordinary rules of construction of the English language, would enable a person of common understanding to know what was meant, and to apprise the defendant of the exact nature of the offence with which he was charged, although the same does not contain all the phraseology and technical language ordinarily used in criminal pleading

2. **NEW TRIAL—Granted, When.** Where a new trial is sought on the ground of newly discovered evidence, and where it is apparent that all reasonable diligence of which the subject is susceptible has been exercised by the defendant to procure the same, and where it is apparent that the evidence not only tends to discredit or impeach the prosecuting witness, but is such as might reasonably affect and probably would change the result of the trial, a new trial should be granted.

3. **EVIDENCE—Criminal Trial—What Competent.** In a criminal prosecution for an alleged assault with intent to kill, where the defendant claims that he acted solely in self defense and to prevent a felony being committed upon him, and some evidence is introduced tending to show that such were the nature and character of his acts, it is then competent for the defendant, in corroboration of such evidence, and to show the state of the feelings existing between the defendant and the prosecuting witness at the time of the alleged assault, to introduce other evidence, tending to show that the person on whom the assault is alleged to have been made, had, a short time previous to said alleged assault, committed an assault upon the defendant with a deadly weapon, and attempted to do him bodily harm with said weapon, where the evidence in the case on trial tends to show that at the time of the alleged assault, the person assaulted had in his possession a weapon similar to that with which the previous assault was committed.

(Syllabus by the Court.)

*Error from the District Court of Kiowa County; before F. E. Gillette, Trial Judge.*

*H. P. McGuire, Howard Parker,* and *E. M. Bradley,* for plaintiff in error.

*P. C. Simons, Attorney General, Don C. Smith, Ass't* for defendant in error.

### STATEMENT OF FACTS.

This is an indictment charging the defendant with the crime of an assault with intent to kill, returned by the grand jury of the district court of Kiowa county, Oklahoma Ter-

ritory, on the 8th day of September, 1904, being one of the regular days of a regular term of the court, charging that the defendant committed said assault upon one James L. Horton, in Kiowa county, Oklahoma Territory on the 28th day of March, 1904. On the 7th day of April, 1905, defendant filed a demurrer to the instrument. Said demurrer was argued and submitted to the court on April 10, 1905, and by the court overruled, to which ruling the defendant excepted. On the same day the defendant entered a plea of not guilty, and the cause proceeded to trial before a jury. On the 12th day of April, 1905, the jury returned a verdict finding the defendant guilty as charged in the indictment. On April 28th, 1905, defendant filed a motion for a new trial, setting up the statutory grounds therein, and in addition thereto, a claim of newly discovered evidence, which was overruled by the court. A motion in arrest of judgment, setting up the grounds stated in the demurrer was also filed on the same day, which the court also overruled, to which the defendant excepted. On the same day the court rendered judgment against the defendant and sentenced him to eighteen months' imprisonment in the territorial prison, to which judgment and sentence plaintiff in error excepted, and brings the case here for review.

Opinion of the court by

IRWIN, J.: A reversal of this case is asked for on three grounds, the first being that the indictment is not sufficient. The charging part of the indictment is as follows:

"Ed. C. McHugh, then and there being, in and upon the body of one James L. Horton, unlawfully, wrongfully, intentionally and feloniously did make assault; and the said

Ed. C. McHugh with the intent then and there unlawfully, wrongfully, intentionally and feloniously, to kill and murder James L. Horton, did then and there, on the date aforesaid, with a certain firearm, to-wit: a revolving pistol loaded with gunpowder and leaden bullets, which he, the said Ed. C. McHugh, then and there in his hand held, with intent aforesaid, did then and there shoot off, at, toward and into the body of him, the said James L. Horton, said pistol then and there and thereby giving to him, the said James L. Horton, a dangerous wound."

The only answer that is necessary to make to this contention is to refer to the decision of this court in the case of *Heatly v. Territory,* reported in the 78 Pac., 79. The language used by Chief Justice Burford, in rendering that opinion, in our opinion clearly, concisely, and unequivocally states the law. The language of that opinion is as follows:

"The first objection presented by counsel for plaintiff in error is that the indictment does not charge a public offense. There is some repetition and surplusage in the indictment, but under sec. 2206, Wilson's Rev. & Ann. Stat., 1903, the material averments necessary to charge a 'public offense are, 'That in the county of Greer, and Territory of Oklahoma, on the second day of September, 1903, one Jeff D. Heatly did then and there intentionally, wrongfully, and feloniously shoot one R. Bell with a certain firearm, to-wit: a shotgun with the intent then and there and thereby to kill him, the said Bell.' The indictment contains all this and more. To hold that it was necessary that the indictment should aver that the shotgun was loaded with gunpowder and leaden bullets, and was had and held in the right hand of him, the said Heatly, and that it was shot off and discharged at and against the body of him, the said Bell, and such other ancient and unnecessary phrases as are usually found in forms presented by Chitty and other law writers of

the remote past, would be to do violence to those provisions of our criminal code which prescribe the requisites of criminal pleading.  By sec. 5357, Wilson's Rev. & Ann. S., 1903, it is provided that the indictment must contain 'A statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended;' and by sec. 536, subd. 6, it is enacted, among other requirements, that the indictment is sufficient if it can be understood therefrom 'That the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language without repetition, and in such manner as to enable a person of common understanding to know what is intended.'   *   *   *.

"It is a common and ordinary mode of expressing the fact to say that one person 'shot another' and when it is said that a man was 'shot,' or that one person 'did shoot' another, every person of common understanding knows what is intended without explanation; and in order to set forth such fact in ordinary and concise language, it is no longer necessary to express in words each component or constituent embraced in the fact.  The term 'did shoot' embraces the weapon, the load, the discharge, and the act of discharging, and it is so meant and understood by courts, counsel, jurors and witnesses, and why should more particularity or repetition be required in a pleading than is required to express the same fact in every day parlance?  The law does not require it, and the necessity for following ancient and obsolete forms made up of repetitions, unnecessary particularization, and crude phraseology, if it ever existed, no longer prevails. *Slutsman v. Territory,* 7 Okla. 490, 54 Pac. 707; *People v. Steventon,* 9 Cal. 274; *People v. Choister,* 10 Cal. 311.  The tendency of prosecuting attorneys to abandon prolix, abstruse, and superfluous terms and phrases in criminal pleading is rather to be commended than condemned.  When the character of the firearm is designated, the manner of using it,

the intent with which the act is done, and the person against whom the act is directed, are averred in plain, common sense English language, the act charged as the offense is sufficiently pleaded, and the law requires no more."

The next assignment of error, in our judgment, presents a more serious question. That is, that the court erred in refusing to grant a new trial on the ground of newly discovered evidence. The evidence claimed to have been newly discovered, was the testimony of Charles Hubbard, and G. H. Chadwick. Said testimony relates to statements made by the prosecuting witness Horton, soon after the alleged assault, and not only tends to impeach the witness Horton, but tends to corroborate the testimony of the defendant as to how the altercation and difficulty occurred. It is first contended by counsel for defendant in error that no diligence was shown in endeavoring to procure this testimony, but from the very nature of the testimony itself, it must be apparent that diligence on the part of defendant or his counsel would have been of no avail in procuring this testimony, because these parties were not witnesses to the transaction, were not persons who were in the vicinity at the time of the transaction, and it would reasonably be supposed they knew nothing of the matter. These conversations with Horton, as testified to by these witnesses in their affidavits, do not seem to have been had in the presence of any third person, but were admissions and statements made by Horton to these witnesses, and according to their affidavits were not communicated to any one until after the trial and conviction of the defendant. So it can be seen that by no reasonable diligence could the defendant have discovered this testimony. Hence, we think he cannot be charged with a lack of diligence.

Now, the question is, is the evidence of that nature which, if it were produced on the trial, would be likely to change the result or probably influence the jury in arriving at a different verdict? The testimony of Chadwick is that on or about the 5th day of June, 1904, he, Chadwick, had a conversation with the prosecuting witness, Horton, about a difficulty which occurred at Cooperton in said county and territory some time in the spring of 1904, as a result of which said Horton was shot by one McHugh. That in said conversation, Horton grew very confidential and stated in positive language that the said McHugh was not the aggressor in the difficulty, but instead of so being, McHugh was trying to get away from him, Horton, when he, Horton, was shot. Chadwick says that Horton made remarks in substance as follows, to-wit: "That d— cowardly s— of a b—, McHugh, is a coward. When I made at him he ran, and he was running away from me when he shot me." Chadwick further says that he never told McHugh about the conversation for the reason he considered himself a friend of both Horton and McHugh, and preferred not to incur the enmity of either of them, nor to get mixed up in any of their troubles and that two years' experience as deputy sheriff had taught him the value of one's keeping his mouth shut concerning matters of other people. He also says the only person he told this was one H. P. Rutherford, and does not recollect making any mention of the same to any other person until he came to the city of Hobart on April 20th, 1905, in response to a telephone message, and at which time, he for the first time related the conversation to McHugh. This witness further says that he left Hobart about the 15th of November, 1904. That he now lives on a farm six miles

southwest of Davidson, Comanche county, O. T., where he
is engaged with his brother, J. M. Chadwick, in farming, his
present address being Davidson, O. T., and that if subpoe-
naed as a witness in the above entitled action, or if his dep-
osition should be taken in same, that he will testify to the
facts stated herein.

The witness Hubbard will testify that he is a resident
of Hobart, Kiowa county, Oklahoma, and has been for about
three and a half years, during which time he has been in the
meat market business. That he knows the prosecuting wit-
ness Horton, and has been on friendly relations with him.
That said Horton is the identical person who was shot in
a difficulty with one C. E. McHugh in the spring of 1904.
He further says that about the middle of the summer of
1904, he was sitting in front of the Palace meat market in
the city of Hobart, when Horton came up and joined him,
and began talking in a very abusive manner about McHugh,
who was not far distant, on the sidewalk, and referred to the
said trouble at Cooperton. That in the course of his re-
marks, Horton said, "That damned coward is afraid of me."
indicating McHugh; "The s— of a b— shot me when he
was running from me." Hubbard further says that at the
time of said conversation with Horton, he was not acquaint-
ed with McHugh, and had not heard anything of what pur-
ported to be the facts of the Cooperton trouble, except that
the two men had had a shooting scrape. That he attached
no particular importance to the remarks of Horton at the
time, presuming that what he said was a fact of general no-
toriety amongst other facts of the trouble. That he thought
no more of said remarks, nor did he communicate them to
anybody until after the trial of McHugh in the month of

April, 1905. That after the trial he heard McHugh discussing the evidence adduced thereat, and especially the evidence of Horton, and being surprised at what Horton swore in court, affiant volunteered to tell McHugh the remarks of Horton in substance as aforementioned. This witness says that his present address is Hobart, O. T., and that if he should be subpoenaed as a witness in the case against McHugh, that he will testify to the facts herein stated.

The affidavit of H. P. Rutherford, the only person to whom Chadwick communicated what he knew about the case, is that he never communicated that to McHugh until after McHugh's trial and conviction.

Now it would seem that this testimony would be of great importance in the trial of this case as it not only tends to corroborate the defendant as to what actually took place at the time of the shooting, but it also tends to discredit and impeach the prosecuting witness, and we understand the true rule to be that where reasonable diligence has been used, if the testimony is such that if it were introduced at the trial, that it would not only tend to impeach or discredit the prosecuting witness, but would be such as would reasonably and probably change the result, a new trial should be granted.

The third assignment of error is that the court committed error in first admitting the testimony of the prosecuting witness as to a previous difficulty between himself and defendant, and then afterwards excluding the same from the jury and instructing them that it was not a proper subject for them to consider in determining the guilt or innocence of the defendant.

An examination of the record we think will show that one reason assigned by the trial court for excluding this testimony from the jury was an error. That is the court on page 120 of the record uses this language:

"The court is further of the opinion that what is shown of record in this case at this time to have occurred in the first encounter is testimony on behalf of the defendant, having been elicited from the territorial witness by the defendant upon cross-examination."

Now the reference to the case made will show that the first reference made by any witness to a previous difficulty between the prosecuting witness and defendant, is on page 17, in the testimony in chief of the prosecuting witness. On page 16, he is asked:

"Q. Did you have any difficulty with the defendant on that day?

"A. Yes sir."

"Q. You may state to the jury what transpired at that time, immediately before and following this difficulty you speak of.

"A. Along that day I was in Cooperton, and me and him had a little trouble, and in about an hour and a half, something like that afterwards,—" and then follows the rest of the answer.

On page 24, of the case made, near the bottom of the page, we find this question propounded by the county attorney:

"Q. You speak of a prior difficulty between yourself and this defendant, how long before the shooting was it that this difficulty occurred?"

"A. It was just about an hour and a half."

Then on cross-examination, without objection, the defense required of this witness and elicited from him his ver-

sion of the difficulty which took place in the saloon as he says about an hour and a half before the shooting. Then again, at page 53, of the record, on re-direct examination, the county attorney, with this same witness, goes into the question of what occurred in the saloon, at the time of the difficulty an hour and a half before the shooting, and examines him fully and completely as to all that took place, what he did, and his reasons for it. So we think it will be seen that this subject was not first introduced in the case by the cross-examination on the part of the defendant, but it was first introduced by the prosecuting witness himself in his testimony in chief. Then it was followed up by cross-examination, and re-followed by re-direct examination. This, we think, would be opening the door wide enough to allow the defendant to prove all the circumstances and surroundings of that transaction. We do not think it would be just to the defendant to allow the prosecuting witness to testify in relation to that matter and give his version of it, and then preclude and prevent the defendant from giving his version of it, and to give other proof to show what the real transaction was. And we think this testimony was competent on another and still stronger ground, that is, that it tended to show the condition of the feelings that existed at the time of the shooting between the prosecuting witness and the defendant. The record in this case shows that at the time of this shooting there was only one disinterested eye witness, and he is not produced to give his testimony in this case. The only parties who were present at the time of this shooting was the prosecuting witness, Horton, the defendant, McHugh, and the keeper of the saloon, Swandy, and Swandy has not testified in this case so far as the record

shows. This difficulty occurred somewhere about eight
o'clock in the evening at or near the back of the saloon.
The testimony of the prosecuting witness and the defendant
is directly opposite and contrary to each other as to what
took place. According to the testimony of the prosecuting
witness, the action of the defendant in shooting him was
without justification or provocation, and that from first to
last the defendant was the aggressor, while the testimony
of the defendant is just as positive, and just as emphatic
that the contrary is true, and that the prosecuting witness
was the aggressor, and that he was assaulting him with a
long necked bottle which he held in his hand in such a way
as to be a dangerous weapon, and that he was retreating
from him, and that his act in firing the shot was reasonable
and necessary self defense. No person who saw the trans-
action comes on the stand to testify as to what took place
except these two interested parties. Now, this being true,
it will be seen how important it is for the jury to determine
who was the aggressor in the affair, and we take the rule to
be that even uncommunicated threats are competent proof
for the purpose only of determining who was the aggres-
sor, and we think it is always competent where the defense
relied upon is self defense, to show previous assaults com-
mitted by the prosecuting witness upon the defendant for
the purpose of showing the animosity and ill-feeling that
existed between them at the time. It would seem only rea-
sonable to us that if previous assaults made by the defend-
ant towards the prosecuting witness, and previous threats
made by him, could be used for the purpose of showing a
motive, or of showing animus sufficient to have prompted
this crime, that the reverse would be true in showing ani-

mus or disposition to commit such an assault as the defendant testifies was made upon him at the time. The gist of this entire decision by the jury must rest upon the proposition as to who was the aggressor.

In the case of *Van Meer v. Territory,* 79 Pac. 264, the opinion was rendered by Justice Burwell of this court, and concurred in by the entire court. In that case it was proven by several witnesses, that the son of the prosecuting witness, just the day before the shooting, and while the defendant and his son were hauling a load of wood off of the prosecuting witness' farm, (which was the real cause of the trouble, but which the defendant claimed to have purchased from a railroad off of whose right of way the wood was cut) pointed a gun at the defendant, and told him that he had orders not to let any one haul wood off of the farm. Several witnesses testified to this fact, but the court, when counsel for the defendant asked concerning this matter of another witness, told the jury that the transaction was incompetent to be considered by the jury, unless it be first shown that the prosecuting witness authorized his son to point the gun at the defendant. The court, however, recognized that it had incorrectly stated the law, and in its instructions told the jury that this testimony was competent, and should be considered by it in determining the reasonable cause for defendant's apprehension of personal injury at and immediately prior to the time of the shooting, and for the purpose of showing the state of mind and feeling between the prosecuting witness and the defendants, but for no other purpose.

From the case made, page 119, it will be seen that when the defendant attempted to prove this previous difficulty be-

tween the prosecuting witness and the defendant, by the defendant, an objection was made to it. The court said:

"The court understood counsel to state that the object of the question was to show some difficulty that was referred to in the cross-examination of the state's witness, in the saloon. The court holds that the transaction is incompetent If you desire to make a record in that I will ask that it be done not in the presence of the jury."

The jury was then withdrawn, and Mr. McGuire, counsel for the defendant, made this statement:

"We want to show by this witness that they had a prior difficulty possibly one hour before this shooting occurred in the saloon run by one Swandy, and that in that difficulty this defendant was struck by the prosecuting witness, Horton, over the head with a bottle, and that the only provocation of the difficulty was the remark made by the defendant to the saloon man, in which he called him a liar, and that Horton immediately struck him on the side of the head with a beer bottle, and struck him several licks after that; that this defendant never at any time drew a lemonade glass on the prosecuting witness, but on the contrary was raising it to take a drink out of it at the time he was struck, and that he immediately quit the saloon and went out to have his head dressed, and that he shortly returned and had his second encounter with the same party, which culminated in the shooting."

Then the court makes this statement:

"By the court: The court is of the opinion that the case should be tried and the rights of the parties determined upon what occurred at the second encounter. The court is further of the opinion that what is shown of record in this case at this time to have occurred in the first encounter is testimony on behalf of the defendant, having been elicited from the territorial witness by the defendant upon cross-

examination. The court is of the opinion and now holds that neither the testimony in chief which shows the existence of the first encounter, nor the testimony here and now offered is material or relative to this case under the statement of defendant's counsel of the defense that is to be interposed, and therefore sustains the objection to the pending question."

To which the defendant objects and excepts. Then the jury was brought back and the court instructed the jury as follows:

"Gentlemen of the jury, there has been offered in evidence in this case upon cross-examination of the territorial witnesses prior to the time of the statement of the defendant's defense, certain testimony showing the details of a difficulty between the complainant and defendant in the saloon prior to the time of this difficulty, as the court now recollects it, of something like an hour or hour and a half. The difficulty complained of, under the statement that has been made, is some time afterwards. The court at this time instructs and advises the jury that that evidence so offered was incompetent of consideration by you in the determination of this case, and you will not consider it in arriving at a verdict in this case." To which instruction the defendant excepted.

The statement of counsel as to the defense that would be interposed, which the court refers to in this instruction, is found on pages 115, and 116, and is as follows:

"Gentlemen of the jury, I shall not make much of a statement at this time in reference to the defense, as perhaps you understand largely from the testimony what that would be. I will just simply state at this time that we will show that they had a very serious difficulty up there in this saloon and in that difficulty this man Horton was the ag-

gressor and without any provocation scarcely he made a
brutal assault upon this defendant with a beer bottle such
as we have here on the table; that Mr. McHugh left the
office at that time and went down by his house, and that he
got his revolver at that time and went on down to the doc-
tor's office, and that he had his head dressed and talked to
several parties around on the street, some perhaps about that
difficulty, and that he repeatedly said he wanted this man
arrested—expressed that to everybody he talked to in re-
gard to the matter—and that later on he was near his home
and that his wife told him to come in the house or something
of that kind, and he told her he hadn't cared for his horses
yet and he would go around and feed his horses; and that
in going to his stable he went the ordinary road he gener-
ally took and his horses were in the rear of the saloon; that
he saw Horton return there in his buggy and he disappeared
and he thought he was in the saloon; that he wasn't expect-
ing to encounter him when he went around that corner; that
after he passed around the corner and turned south at the
extreme southeast corner, he saw a man standing against
the wall; that he kept on.   When he had seen Mr. Horton
before, he was wearing a broad brim black hat and he
didn't recognize him as being Horton at that time, but when
Horton raised up, as he was leaning against the building,
he saw who he was, and he suggested or was about to suggest
where his hat was, and that Horton started at him, and that
he had at that time in his possession a bottle,—perhaps not
this one, but a similar bottle, a bottle such as was described
here by the prosecuting witness himself as having; that he
had it in his coat or in some manner concealed, but brought
it so he could see it.   He could not tell at the time whether
it was a club or what it was, but he raised it to strike him
and that he grazed one of his ears, the one that was not
wounded in the first fight,—and that he pursued some ten or
twelve feet to the east of this building striking at him all
of the time, and that he raised his pistol or took it out of

his pocket. He had it in his pocket and when he went to draw it out of his pocket it hung and tore his clothing and he finally got it out and raised it and shot. That it wasn't his intention at the time to even shoot and give him a death shot. It was his intention to shoot him in the right arm. He was on the left side of him and the ball went under here as has been testified to and ranged downward through his shoulder. That Horton, quick as he was shot, stepped back; and that he turned and went around the corner of the saloon and gave himself up. That he didn't go around there with the purpose or having in mind this man, much less shooting him. The testimony will show that what he did around there was in order to save his life, or preventing this man from making another assault as he had done that afternoon, and with that showing we will ask a verdict of acquittal at your hands. And I might further suggest that after Horton had been taken into this doctor's office this bottle was taken out of his hip pocket by some one who was present."

We think that for a more clear understanding of the reason of the court for excluding this testiomny, it is necessary that we consider a conversation between the attorney for the defendant and the court as shown by the record on page 117 and 118. On page 117, the question is asked of the witness, Leroy Underwood, a witness for the defendant:

"Q. I wish you would state to the jury what occurred in that difficulty as you saw it there on that occasion?

"A. Well, I don't know as I could exactly state; it has been a good long while ago.

"Q. Well, as you remember."

Here the territory objects to statement in reference to details of first difficulty, as incompetent, irrelevant, and immaterial.

"By the court: Do you mean by this question to inquire in reference to the first difficulty that occurred in the saloon as shown upon cross-examination?

"By Mr. McGuire: Yes sir. We offer it simply to show the disposition at that time of this prosecuting witness; show his aggressive character; show the animus that naturally would exist between the parties.

"By the court: The court is of the opinion, after hearing the statement of the defense relied upon, that it is immaterial what took place in the saloon there at the commencement of this difficulty. If the defendant, as stated in his statement, was going back to feed his horses and was assaulted by the complaining witness as stated in the statement of the defense, the first difficulty that was shown upon cross-examination before the statement of the defendant had been made, is absolutely immaterial in this case, and forms no part of the body of the offense. I think the objection is well taken. Defendant excepts."

By these remarks it is very evident that the court did not take into consideration in rendering this decision a very material element in this case, which the jury in arriving at a just verdict must decide. That is, as to just who was the aggressor at the time of this second difficulty, and it is apparent from the statement of counsel for the defendant that their purpose in asking this question and for developing the testimony as to this previous difficulty was to determine the reasonable cause for defendant's apprehension of personal injury at and just immediately prior to the time of the shooting. Because it is there said by Mr. McGuire, "we offer it simply to show the disposition at that time of this prosecuting witness." Now, this was a material matter to be considered by the defendant in determining whether at

the time of the shooting he was in danger. If it was true that the prosecuting witness had, an hour or an hour and a half previous to that time, without provocation or justifiable cause, with a deadly weapon, such as a beer bottle held in his hand by the neck, made a murderous assault upon him and inflicted the injuries which are shown by the testimony to have been inflicted, then he had more reason to apprehend danger and to fear bodily harm from this prosecuting witness than he would have had if this difficulty had not occurred.

In Archibald's Criminal Practice and Pleading, vol. 1, page 901, of the 7th ed., the author uses this language:

"Naked threats, unaccompanied with personal violence, are admissible to show the reasonableness of the defendant's fears, provided a knowledge of the threats were brought home to him. As a general rule, it is expedient to receive all the evidence which goes to show the state of feeling of the parties towards each other at the time of the act committed. And, for the same purpose, testimony may be given of lawsuits existing between the parties." *Monroe v. State*, 5 G. 85.

On the same page, the author uses this language:

"Proof that, as a justice of the peace, the accused had prosecuted the deceased for embezzlement of the county school fund, and that, in consequence thereof, the deceased vowed that the defendant should not be at the trial of said indictment, because he would kill him, is admissible in connection with other circumstances to establish that the defendant was in fear of his life from the deceased, and that the killing was in self defense." Citing the same case.

"Where it appears that the deceased went to the house of the accused with a hatchet in his hand, the latter may prove that the deceased had, on the day of his death, and on

other occasions shortly previous, made threats against him."
Citing *Campbell v. The People,* 16 Ill. 17.

In *Cornelius v. Com.* 15, B. Mon. Rep. 539, on a trial for
murder, the prisoner introduced evidence to prove that the
deceased had, a short time previous to the homicide, made
threats against him, and had tried to hire persons to kill
him, which facts had been communicated to him. He then
offered to prove, by other witnesses, that the deceased had
threatened to kill him, which threats were made a few days
before he was killed; but as the latter threats were not com-
municated to the prisoner, they were, on this ground, exclud-
ed by the court: *Held,* that this testimony ought, under the
circumstances, to have been admitted, as tending to confirm
the other evidence that deceased had made threats against
the prisoner, and to counteract a presumption of fabrication
by the witnesses who gave that testimony.

Now, we think the universal holding of the courts is,
that communicated threats are always admissible as tend-
ing to show the reasonableness of the fear entertained by
a person who claims to have acted in self defense, and the
only class of threats which are excluded by any court for
this purpose, are uncommunicated threats. Now, if mere
threats are competent, when communicated, it would seem
to us that a stronger reason exists for admitting overt acts
of hostility which amount to an assault with a deadly weapon.
An assault, if committed would require no further agency to
apprise the defendant of the malicious intention of the pro-
secuting witness. The acts are committed upon him, and
would be still stronger in their nature than any communi-
cated threats could be, and it seems to us they were clearly
competent to show the reasonableness of the fear which the

defendant says he entertained at the time he fired the shot as it would tend to show the feelings existing between the prosecuting witness and the defendant, and it would have the purpose of corroborating, by inference at least, the testimony of the defendant when he says that he acted in self defense.

In the case of *State of Kansas v. Charles R. Scott,* 24th Kan. 50, the court says:

"This was a criminal prosecution for assault with intent to kill. The state of Kansas was plaintiff, Charles R. Scott was defendant, and Herman Richner was the person alleged to have been shot. The defendant was convicted and sentenced, and he now appeals to this court. That the defendant shot Richner, with a gun, loaded with shot, there can be no doubt; but still, the defendant claims that the transaction did not, under the circumstances, amount to a felonious assault. Indeed, he claims it did not amount to any offense at all. He claims, among other things, that he did the shooting in defense of his own person; and whether the shooting was in self defense or not, was one of the principal questions in the case. Defendant's wife was placed on the stand, and asked this question. 'Prior to this day (meaning the day of the shooting) state when, if ever, you saw any attack made by Herman Richner, in your own house, with a deadly weapon, upon your husband, and what threats Richner then made.' The defendant here offered to prove by the witness that some months prior to the alleged offense, Herman Richner, at the house of the defendant, did make an assault upon the defendant, by means of a heavy iron rasp, a deadly weapon, did wound the said defendant over the head, threatening to kill him, and would have done so unless prevented; to which offer the plaintiff objected that it is irrelevant, which the court sustained, and to which the defendant then and there excepted and still excepts. Thereupon, the defendant asked the witness, 'State whether

or not you know the character of Herman Richner for tur-
bulence and violence, and the state of his feelings toward
the defendant.' The defendant here offered to prove that
the prosecuting witness, Herman Richner, was a turbulent,
violent, quarrelsome, and dangerous person, who was in the
habit of carrying deadly weapons and was at enmity of long
standing with the defendant; had had numerous encounters
with the defendant, and had made frequent threats which
had been communicated to him. To this the plaintiff ob-
jected as irrelevant, and the court sustained the objection,
to which ruling the defendant then and there excepted, and
still excepts.

"It was the defendant who fired the gun which was
heard by the defendant's wife, and it is that shooting for
which the defendant is now prosecuted, and which he
is now charged with having committed an assault with in-
tent to kill.

"We think the court below erred in excluding the said
evidence of the defendant's wife. Said evidence (along with
the other evidence in the case, and being corroborative of
much of such other evidence) was competent, not only as
tending to show that Richner was in fact about to commit
a felony upon the person of the defendant, but also as tend-
ing to show that the defendant believed that Richner was
about to commit such felony. If all the facts which the
defendant's evidence tended to prove were true, the defend-
ant undoubtedly had a right to defend himself with a gun,
even to the taking of the life of Richner. In many cases
it is not competent for a defendant in a criminal prosecu-
tion to show prior transactions, or prior troubles; but in
this case we think it was. In this case we think it was com-
petent for the defendant to show the prior assaults and prior
threats made by Richner, with regard to himself; for such
evidence not only tended to show the nature and character of
Richner's acts at the time the alleged assault was committed.
but it also tended to show the nature and character of the

defendant's opinions, beliefs, and intentions. We think that the said excluded evidence should have been submitted to the jury. * * *

"The judgment of the court below will be reversed, and cause remanded to the court below for a new trial."

Now we think this case is almost a parallel case with the case at bar. It is true that in the Kansas case there was not only an assault, but there were threats accompanying the assault, but we do not think this changes the rules. The supreme court of Kansas there holds in unmistakable terms to the doctrine that this previous assault was admissible for the purpose of showing the reasonableness of the fear which the defendant claims he entertained at the time of the assault, as well as to show the nature and character of the prosecuting witness, and his feelings towards the defendant.

As before stated in this opinion, we think if communicated threats may be shown for the purpose of showing that the defendant at the time of the assault had reason to believe that he was in danger, and to show the feelings that existed between prosecuting witness and defendant, then there is much more reason to insist that a prior assault would be admissible for the same purpose; and in the case of *State of Kansas v. Frances M. Brown,* 22 Kas. 222; the supreme court says:

"In a trial for homicide evidence of threats made by the deceased person against the defendant but not communicated to him before the killing, is admissible in cases where the acts of the deceased in reference to the fatal meeting are of a doubtful character. The evidence is not relevant to show the *quo animo* of the defendant; but it may be relevant to show that at the time of the meeting the deceased was seeking defendant's life."

In *Binfiel v. State,* (Neb.) 19 N. W. 607, it is held.

"Uncommunicated threats are admissible only to illustrate or explain some act of the deceased which might tend to justify the homicide."

The Kansas supreme court again, in the case of *State v. Sorter,* 34 Pac. 1036; use this language:

"Where there have been previous controversies and difficulties between the defendant and the deceased, the existence of such controversies and difficulties may be shown by the defendant, in order to show the state of feeling between them; but the court would not be warranted in trying the merits of such controversies, nor in entering upon a detailed examination of the facts as to who was right and who was wrong in any former quarrel between them."

Now, while it is true that in this case the Kansas supreme court holds that the merits of the previous difficulty or the details of it are not competent, yet it must be borne in mind that in the case at bar, by the direction and instruction of the court, the entire matter of the previous difficulty is removed from the consideration of the jury, and they were instructed to disregard it entirely and not to take it into consideration for any purpose in the trial of the case. It might be urged in support of the ruling of the court, that the parties by their questions asked for the details of the previous difficulty, and for that reason it was properly excluded. But we think this contention cannot be maintained when we bear in mind that prior to the defendant being asked to give the details of this previous difficulty, both the prosecution and the defense had gone into the details of the transaction, and the prosecuting witness had been permitted without objection to give his version of that transaction, and to make his explanation and excuse concerning the same,

and that his testimony developed the fact that in that transaction the defendant was the aggressor, and had made an assault upon him with a lemonade glass. Now, under this condition of things, we think that justice to the defendant would require that he be allowed to go into the details of the transaction and to give his version of it. It is true that the court, by an instruction, directed the jury to disregard all testimony concerning that previous transaction, but it has been repeatedly held by the courts of the country that where testimony is admitted which from its nature, affects and prejudices the rights of the defendant, that this cannot be entirely removed from the mind of the jury by an instruction to disregard it.

The supreme court of California, in the case of the *People v. Hecker,* 42 Pac. 307; in the syllabus, use this language:

"Deceased, whose two strayed horses had been found by defendant, had some altercation with the latter as to whether he was entitled to a reward which had been offered, and in defendant's endeavor to regain possession of the animals, in order to secure his lien, deceased, upon interfering, was killed. *Held,* that there was no error in admitting evidence with regard to a similar interference by deceased in a previous attempt of defendant to regain possession of the animals."

In a recent work, Elliott on Evidence, vol. 4, p. 340, sec. 3041; that author says:

"So on the issue of self defense, defendant may show that deceased had time and again assaulted him," and cites as authority for this proposition, *State v. Graham,* 61 Iowa 608, 16 N. W. 743; *Enlow v. State,* 154 Ind. 664, 57 N. E. 539.

In a very recent work by Hughes, on Instructions to Juries in Civil and Criminal cases, 253, sec. 257; that author says:

"Evidence that the deceased had previously threatened the defendant is under some circumstances very material in determining whether the defendant in good faith acted under a just fear of danger to his life."

Now, under the well recognized rule adopted by all courts in reference to the doctrine of self defense, that it is not absolutely essential that the danger should be actual, positive, and imminent so as to make the defense absolutely necessary, if it is apparent, and the defendant had reasonable apprehension and grounds for such apprehension, and acted on such apprehension, it will be sufficient to excuse him. In other words, he is justified in acting upon the facts as they appeared to him at the time, provided such transaction is sustained by reasonable evidence, and is not to be judged by the facts as they actually were, or as they might appear to the jury. Now, bearing in mind this rule, it will be seen how material and essential was this testimony concerning this previous assault, as throwing light upon the condition of the defendant's mind at the time of the shooting, and tending to show whether his apprehension of danger was reasonable, and was supported by sufficient evidence to justify his acting upon such apprehension.

Now, in this case we think there is strong reason for holding that this previous difficulty was admissible, as the evidence in the case shows that when the person shot, to-wit, the prosecuting witness, Horton, was taken to Dr. Baker's office and searched, it was found he had in his hip pocket a cognac brandy bottle which was described in evidence as

a bottle similar in kind, character and size to the beer bottle with which the previous assault was committed on the defendant. The evidence further shows that just prior to this shooting, he went to his buggy, took this bottle out and put it in his outside coat pocket. Now, from this evidence, it is apparent that at the time of the shooting, the prosecuting witness was armed with a weapon similar to that which the defendant claimed, and with which the proof shows, the previous assault was committed.

Now, under all these circumstances, in view of the fact that this testimony was first introduced in the case by the prosecution, and in view of the fact that the defense relied upon 'in this case was self defense, and that it was very essential that the jury should know from the evidence who was probably the aggressor in the affray, and from all the facts and circumstances surrounding the case, we think this testimony should have gone to the jury, and we think it was error to exclude it.

For the reasons herein expressed, the decision of the district court is reversed and remanded, with directions to grant a new trial in the case.

Gillette, J., who presided in the court below, not sitting; all the other Justices concurring.